[No. H025304. Sixth Dist. Dec. 15, 2003.]

In re ERNEST SMITH, on Habeas Corpus.

**Counsel**

Bill Lockyer, Attorney General, Robert R. Anderson and Paul D. Gifford, Assistant Attorneys General, Susan Duncan Lee and Allen R. Crown, Deputy Attorneys General, for Appellant.

Picon & Defilippis and Steve Defilippis, under appointment by the Court of Appeal, for Respondent.

**Opinion**

**WUNDERLICH, J.—**

## I. Statement of the Case

In 1980, respondent Ernest Smith (Smith) shot and killed his wife. He pleaded guilty to second degree murder and admitted using a firearm and as a result was sentenced to an indeterminate term of 17 years to life. On February 28, 2001, the Board of Prison Terms (the Board) conducted a parole consideration hearing, and a majority found Smith suitable for parole. (See Pen. Code, § 3041.)[1] On July 9, 2001, the Board's Decision Review Committee approved the Board's decision. However, on August 8, 2001, appellant Governor Gray Davis (Governor) reviewed and then reversed the Board's decision, finding that Smith was still too dangerous to be released on parole. (See § 3041.2; Cal. Const., art. V., § 8.) Thereafter, Smith filed a petition for a writ of habeas corpus in the Santa Clara County Superior Court, challenging the Governor's decision. The superior court granted the writ, finding that (1) the Governor's decision was improperly based on a blanket no-parole policy for convicted murders; (2) the decision violated the ex post facto clause of the federal Constitution; and (3) the decision was not supported by "some evidence." The court ordered that Smith immediately be released.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

The Governor now appeals from the trial court's order, challenging all three findings by the court.[2] (See § 1506.)

We agree with the trial court that the Governor's decision cannot stand and that Smith is entitled to writ relief. However, we disagree with the order directing Smith's release, and remand the matter for the court to enter a new and different order directing the Governor to vacate his decision.

## II. Background

### A. Smith's Criminal History and the Commitment Offense

Prior to the murder, Smith had no criminal record. As a child, however, Smith and his stepfather did not get along, and Smith once pushed him to prevent him from abusing his mother. At 13, Smith spent time at juvenile hall after his stepfather complained about his uncontrollable behavior. Thereafter Smith periodically lived with other relatives. Smith was also taken into custody once for joyriding, but he was not prosecuted. At 17, Smith joined the Army. He was AWOL (absent without leave) twice, spent one year in the stockade, and received an undesirable discharge.

In February 1978, Smith, who was then 28, married Tina Garner, who was 19.[3] Her parents disapproved because of Smith's age, tattoos, and use of drugs. Smith and Garner then moved to Oregon because Smith thought her friends were a negative influence on her. According to Smith, Garner was flirtatious, and he suspected she was being unfaithful. At his parole hearing, Smith admitted that in Oregon he slapped and/or grabbed Garner seven or eight times, and they went to a minister for counseling. Smith also acknowledged that the minister arranged for Garner to go to a battered women's shelter, but Smith interceded, and she did not go. Smith further admitted that when Garner expressed a desire to return to San Jose, he went into a rage and told the minister that he had guns and would follow her and kill her. He said the Charles Manson case was nothing compared with what he would do to Garner and anyone else who got in his way. Smith said he now appreciates the minister's efforts to help them.

In April 1980, Garner returned to San Jose to live with her parents. A few weeks later Smith joined her. At the time Smith was using marijuana and

---

[2] We stayed the trial court's order pending appeal.

[3] Smith was already married and had two sons. At the parole hearing, he acknowledged that he had not divorced his first wife before he married Garner.

amphetamines.[4] In his statement in the 1980 probation report, Smith explained that Garner had found a job at a state psychiatric hospital, but he objected. On May 22, 1980, he asked her to accompany him job hunting. When she refused, " 'he began to shake uncontrollably because he could no longer tolerate the pressure from his disintegrating marriage and his wife's parents' hostility. When [he] asked [her] if she was seeing another man, [she] replied in the affirmative and stated she did not want anything further to do with [him]. [Smith] began pounding his head with his fists and stated he could not take anymore of this anxiety. [He] took a .22 caliber handgun from a dresser drawer and shot his wife once in the head. He shot [her] twice more as she was falling to the floor.' " Later that morning, Smith went to a church, asked people to pray for him, and asked them to call the police. At the parole hearing, Smith said that he had used drugs on May 18, four days before the offense but not on that day.

## B. Smith's Parole Hearings

On November 6, 1980, Smith was received by the Department of Corrections, and it set October 19, 1989, as his minimum eligible parole date. Over the years Smith had several parole hearings. After the last one on February 28, 2001, the Board found him suitable for parole.[5]

Before summarizing the evidence presented to the Board, we briefly review the statutes and regulations governing parole suitability hearings. Under section 3041, subdivision (a), release on parole is the rule, rather than the exception. This section requires that the Board set a release date unless it determines that "consideration of the public safety requires a more lengthy period of incarceration . . . ." (§ 3041, subd. (b).) In making this determination concerning convicted murderers, the Board is guided by the criteria set forth in title 15, division 2, chapter 3, article 11 of the California Code of Regulations.[6] (Regs., § 2400.) Section 2401 of the Regulations requires the Board to set a release date if the prisoner is found suitable for parole under Regulations section 2402, subdivision (d), which enumerates circumstances tending to show suitability; conversely, the Board must deny a parole date if the prisoner is found unsuitable under Regulations section 2402, subdivision

[4] Smith explained that starting as a teenager, he sniffed glue, drank alcohol, and started using drugs, which ultimately included marijuana, LSD (lysergic acid diethylamide), amphetamines, barbiturates, mescaline, PCP (phencyclidine), cocaine, heroin, and methamphetamines. Indeed, he once was hospitalized for an overdose.

[5] The last hearing was actually a rehearing. At a hearing on April 4, 2000, the Board found Smith suitable for parole. However, on September 11, 2000, the Decision Review Committee disapproved the Board's decision and recommended a rehearing, which was then held on February 28, 2001.

[6] We refer to the California Code of Regulations as the "Regulations" or "Regs." All further references to the Regulations are to title 15, unless otherwise specified.

(c), which enumerates circumstances tending to show unsuitability.[7] Section 2402, subdivision (a) of the Regulations generally provides, in relevant part, "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Regulations section 2402, subdivision (b) requires the Board to consider "[a]ll relevant, reliable information available" in determining suitability.

Here, the Board considered Smith's entire record, which included the facts concerning Smith's background and commitment offense summarized above. The Board also considered a 1999 evaluation by staff psychologist L. W. Berning. Berning reported additional background information. Smith's biological father left the family when Smith was five or six years old. His mother remarried, but her new husband was an abusive, angry, and critical alcoholic, who showed little interest in Smith. Smith's biological father also remarried, but when Smith expressed interest in living with him, his father rejected him, saying he and his wife were going to adopt a child. Around this time, Smith started using drugs.

Berning related Smith's explanation of his offense. According to Smith, Garner was " 'easy going and fun' " but also sexually promiscuous, and her gregariousness attracted other men, which made him jealous and insecure. When he expressed these feelings, she was not responsive. Smith told Berning that at the time of the offense he was immature, possessive, and self-centered and dealt with his jealousy and insecurity by trying to control Garner's activities and her contact with friends.

---

[7] Circumstances showing suitability are that (1) the prisoner has no record of assaultive conduct as a juvenile; (2) the prisoner has a stable social history; (3) the prisoner by word and/or deed has shown remorse for the commitment crime; (4) the prisoner committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) the prisoner committed the offense as a result of battered woman syndrome; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner is of an age that reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) the prisoner has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Regs., § 2402, subd. (d)(1)–(9).)

Circumstances showing unsuitability are that (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner—i.e., multiple people were attacked, injured, or killed; the offense was committed in a dispassionate and calculated manner, such as execution-style; the victim was abused, defiled or mutilated; the offense was committed with an exceptionally callous disregard for human suffering; or the motive was trivial relative to the offense; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner previously has sexually assaulted another individual in a sadistic manner; (5) the prisoner has a lengthy history of severe mental problems related to the offense; and (6) the prisoner has engaged in serious misconduct while in prison. (Regs., § 2402, subd. (c)(1)–(6).)

Smith acknowledged that Garner did nothing to provoke the shooting, and he assumed full responsibility for it. He said he now understands the effects of being rejected as a child and how he tried to control Garner to avoid losing her and re-experiencing rejection.

Given Smith's history, Berning stated that his diagnoses continued to be "Axis I: Polysubstance Dependence, *in Remission.*" (Italics added.) In this regard, Berning observed that while incarcerated, Smith had participated in Alcoholics Anonymous for 14 years and Narcotic Anonymous for three and a half years. He also completed three substance abuse groups with each one lasting eight weeks. Berning further found an "Axis II: Personality Disorder NOS, with Narcissistic Features, *Improved.*" (Italics added.)

Given Smith's family history, Berning explained that Smith "indeed felt rejected not only by his natural father but by his highly critical stepfather. He learned to expect rejection from others but apparently explored the issue no further until after the crime. Instead, the inmate avoided looking at these personal issues by using drugs and engaging in adolescent activities. His selection of his second wife was precisely the kind of person which would engender feelings of insecurity and second thoughts regarding a personal commitment. The inmate's own activities tended to drive away her friends and isolate his wife which eventually led to his expectation that she would reject him. The inmate's displaced rage coupled with a difficulty in looking beyond his own personal needs resulted in this crime of passion."

In assessing Smith's dangerousness, Berning stated, "[Smith] was raised in a very unstable and personally rejecting family structure. There is no early pattern of aggression or serious violation of rules. His only crime was the commitment offense. The inmate attempted to make commitments through traditional marital relations but his internal preoccupation with personal rejection and lack of trust with others guided his selection of a second wife. These underlying preoccupations were largely unconscious, and his level of insight and empathy were clouded by his own painful feelings and extreme rage. [¶] As has been noted in previous documentation, the inmate has completed a very positive level of programming since his period of incarceration. In addition, illicit drugs do not appear in any way to be seen as desirable by [Smith]. And finally, [Smith's] increasing insight into his personal dynamics tends to substantially lower the risk for reoffending. Given these observations, it is concluded that [Smith's] potential for violence in the community is in the low end of the average range and would continue to decrease with time."

In addition to Berning's report, the Board considered a 1999 Life Prisoner Evaluation by M. Marsden, Smith's Correctional Counselor. He opined that "[t]he key to [Smith's] success lies in his ability to avoid substance abuse. [Smith's] success on parole will be predicated upon his ability to abstain from the use of alcohol and narcotics. It is not unreasonable to believe that there is an element of unpredictability that would pose a degree of threat to the community should he resume his addictive lifestyle. Prior to release, Inmate Smith could benefit by continuing his present program, remaining disciplinary free, participate in self-help/therapy groups, and continue his involved [sic] in Alcoholics Anonymous and Narcotics Anonymous 12-step process by working the steps and practicing them daily." However, Marsden concluded, " 'Considering the commitment offense, prior record and prison adjustment, the writer believes the prisoner would probably pose a low degree of threat to the public at this time if released from prison. He has continued to remain disciplinary-free and displayed a positive institutional adjustment since his incarceration.' "

At the parole hearing, Smith confirmed the information noted above about his personal background, the crime, and his abusive conduct and threats toward Garner. He said he feels terrible and embarrassed about his crime and the unhappiness it has caused her family and thinks about it often. He has attempted to make amends by volunteering to help inmates, like himself, who came from broken homes, got involved with drugs, failed to understand their anger, and now want to assert control over others. When the Board ask how he would now deal with the type of relationship problems he had with Garner, Smith noted that he was 51 years old and more mature and secure with himself. He said he believed a woman has the right to be who she is, and if she wanted to be independent, then she could go her way and he would go his, knowing that she is happy living the life she wants to live.

The Board considered evidence that while incarcerated, Smith obtained a General Education Diploma (GED) and an associate of arts degree from Chapman University and completed seven UCLA extension courses. He also obtained a Paralegal Certificate and a certificate in Biblical Studies from Patton College. The Board noted that in addition to Smith's active involvement in substance abuse programs for over 14 years, he was commended for conscientious work as the group leader in a 12-step program. Smith also participated in therapy for 15 years, nine of which involved a process group for spouse killers, and a Buddhist Meditation Study group. In 2000, the psychologist who led Smith's process group reported that his participation and amenability to treatment were good, he scored a high evaluation, and his need for further treatment was low.

Smith also received laudatory recognition in 1998, 1999, and 2000 for his active participation in the Recreational Aid Program, the California Men's Colony Literacy Program, and the Activities for Daily Living Program, helping inmates with mental problems. Indeed, he volunteered to work and live in their part of the prison facility. A report noted that since 1997, Smith " 'continues to volunteer his time to low functioning Enhanced Outpatient inmates [(EOP)] and Activities for Daily Living [(ADL)] inmates. Mr. Smith displays a sincere interest in contributing his weekends tutoring these inmates. The EOP and ADL inmates suffer from severe mental illness and require additional supervision and support. Mr. Smith's eagerness to help other inmates enhance their literacy skills and should be commended. He is an invaluable asset to this group and its sponsors.' "

Concerning Smith's employment prospects, the Board noted that he had been certified as an Associate Electronics Technician, he has been on the job and considered a critical worker for 11 years, and his current work supervisor described him as a skilled professional who needs little supervision. When asked about his future plans, Smith said he would live with his son in Santa Clara and work for a company called Weslan Plastics. Smith presented a letter from Rick Weston, the CEO (Chief Executive Officer) of Weslan and a friend of Smith's, who reiterated his long-standing offer of employment as well as personal support. The Board also had before it a letter from Smith's cousin, who wanted Smith to come and live and work at his business in Hawaii, and a job offer from an Encino software/hardware company, stating that he " 'would be a valuable asset in the technical support and computer assembly department.' "

Smith said he also would complete his bachelor of arts degree at San Jose State University, and continue his literacy tutoring for inmates and participation in Alcoholics Anonymous and/or Narcotics Anonymous groups. He hoped to become a group sponsor. In this regard, he pointed out that he has been clean and sober during his 20 years of incarceration and knows the 12 steps. He presented a letter from the President of the All Amigos Alano Club, an Alcoholics Anonymous meeting place, inviting him to visit after his release.

The Board observed that in 1998, Smith was given a one-year parole denial with a recommendation that he "remain disciplinary-free and participate in self-help and therapy," and he successfully complied with this recommendation. Indeed, Smith was disciplinary free throughout his entire incarceration.

The Board further acknowledged numerous letters of support from his family and longtime friends as well as a letter from William Landsdowne, Chief of the San Jose Police Department, urging the Board not to release Smith " 'until he serves the maximum time prescribed by law.' " At the

parole hearing, Santa Clara County Deputy District Attorney Rod Braughton noted that before entering prison, Smith had been discharged from the Army as undesirable, he abused drugs, he was a bigamist, and he cruelly killed someone he purported to love. However, while incarcerated Smith had been a model prisoner and done everything asked of him. Braughton expressed no opinion concerning Smith's release and simply urged the Board to do "the right thing, whatever that is."

As noted, a majority of the Board found Smith was suitable for parole and that he would not pose an unreasonable risk of danger to society or a threat to public safety if released. In support of this conclusion, the majority relied on several of the factors showing suitability enumerated in the Regulations. (See fn. 7, *ante*, p. 352.) Smith had no history of assaultive conduct as a juvenile or criminal conduct as an adult. (Regs., § 2402, subd. (d)(1) & (6).) He committed the offense as a result of stress arising from an abusive childhood, a tumultuous relationship with his wife and her parents, and chronic drug use. (Regs., § 2402, subd. (d)(4).) He acknowledges the nature and magnitude of his crime, accepts responsibility for it, and desires to be a good citizen. (Regs., § 2402, subd. (d)(3).) Through therapy, he understands that he had an abusive relationship with his wife due to his need to control her and has taken steps to correct this behavior. His positive institutional behavior without any disciplinary action over many years indicates significant improvement in self-control. (See Regs., § 2402, subd. (d)(9).) His various educational, therapeutic, self-help, and vocational programs and activities have enhanced his ability to function out of prison. (Regs., § 2402, subd. (d)(9).) His maturation, growth, understanding, insight, and age reduce the probability of recidivism, as confirmed by the psychological evaluation. (See Regs., § 2402, subd. (d)(7).) He has maintained close ties with family and has a realistic parole plan that includes employment and family support. (Regs., § 2402, subd. (d)(8).)

The Board set Smith's base term for the murder at 20 years because it was aggravated by the fact that he inflicted serious bodily injury, he had a special relationship to Garner, she was particularly vulnerable, he had engaged in a ongoing pattern of physical and mental abuse, and he had an opportunity to stop the crime but instead continued. In addition, the Board attached the following conditions to Smith's parole: No drugs or alcohol and submission to testing for both; participation in Alcoholics Anonymous and/or Narcotics Anonymous; and attending the parole outpatient clinic.

The dissenting Board member expressed some reservations about whether Smith fully comprehended the nature of the abusive relationship he had with Garner. However, he opined that "I'm not so adamantly opposed to your

parole because of it." He then wished Smith good luck.

After the hearing, the Board's determination went to the Decision Review Committee, which approved it and made it effective on July 9, 2001. However, on August 8, 2001, the Governor reversed the Board.

### C. The Governor's Decision

Before summarizing the Governor's decision, we shall review constitutional and statutory provisions related to his authority to review actions by the Board.

■ Article V, section 8, subdivision (b) of the California Constitution, which was added by initiative (Proposition 89) in 1988, permits the Governor to review every decision by the Board granting, denying, revoking, or suspending parole of a person sentenced to an indeterminate term upon conviction of murder and further authorizes the Governor to affirm, modify, or reverse a decision "on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8, subd. (b).)

Section 3041.2 provides, in relevant part, "(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority . . . the Governor, when reviewing the authority's decision pursuant . . . , shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority . . . he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

In his written decision, the Governor found that Smith had an unstable social history, noting his long-term drug and alcohol abuse, his time at juvenile hall for uncontrollable behavior, his "bad paper discharge" from the Army, his bigamist marriage, and his violence against Garner. The Governor also found that Smith's offense was "a callous crime," noting it was not an isolated incident, but "the culmination of a continuing pattern of drug use, instability and violence that Mr. Smith perpetrated on his wife." The Governor opined, "In light of this deep-rooted pattern, I am concerned that Mr. Smith's propensity for violence in the free community cannot be adequately predicted at this time." The Governor acknowledged that Smith has participated in counseling to address problems related to spousal abuse and anger management but found that "gains made in these areas are recent and I

believe that Mr. Smith requires additional counseling and more time to demonstrate that he can maintain these gains outside of the institutional setting."

The Governor also found that "Mr. Smith requires additional counseling in the area of substance abuse." The Governor reasoned that Smith "ingested a staggering volume of drugs over a period of approximately 18 years. This type of sustained behavior demonstrates that Mr. Smith's desire to use drugs was deeply entrenched. The record indicates that a return to drugs would substantially increase the potential for Mr. Smith to return to violent criminal behavior."

The Governor concluded, "In light [of] the gravity of [the] offense, his history of past violence against his wife, his unstable social history, and his need for additional anger management and substance abuse counseling, I believe that Mr. Smith still poses a danger to public safety. Accordingly, I REVERSE the Board of Prison Terms' decision to parole Mr. Smith."

## D. The Habeas Corpus Proceedings

On February 6, 2002, Smith filed his petition for a writ of habeas corpus, seeking immediate release on parole. In it, Smith first claimed that the Board's determination became final by operation of law on May 27, 2001, and, therefore, the Governor's purported reversal on August 8, 2001, was time-barred and void. (See Regs., §§ 2041, subd. (d)(2), 2043.)

Smith next claimed that the Governor's action denied him due process of law and violated the constitutional proscriptions against ex post facto laws (U.S. Const., art. 1, § 10; Cal. Const., art. 1, § 9) and the constitutional provision ensuring separation of powers (Cal. Const., art. 3, § 3). Specifically, Smith alleged that the Governor has a blanket no-parole policy for convicted murderers, and he based his decision on this policy rather than an individualized consideration of Smith's case in light of factors established by the Legislature to guide parole decisions.

Last, Smith alleged that the Governor's decision is based on false and irrelevant facts and information, and as a result there is no evidence to support it.

On April 5, 2002, the trial court issued an order to show cause, finding that Smith had made a prima facie case for relief. The court took judicial notice of the " 'uncontroverted evidence' of the 'no parole policy' " set forth in the concurring opinion of a recently filed appellate court case.[8] Given this and

---

[8] The court cited *In re Rosenkrantz* (Jan. 18, 2002, B151016). However, before the Governor filed his return, the California Supreme Court granted review in that case (May 1, 2002,

additional material submitted by Smith, the court found a sufficient basis to conclude that "the Governor is only going through the motions of giving individualized treatment and due consideration to inmates when he reviews a grant of parole." The court further opined, "If, after weighing what evidence the People will present on this issue, the existence of a 'no parole policy' is proven, the continued validity of Petitioner's plea may be in question." In this regard, the court reasoned that the use of a no-parole policy would, in effect, retroactively deny Smith the benefits of his plea bargain, which he entered reasonably believing that he could and would, eventually, be released on parole.

On July 5, 2002, the Governor filed his return, generally and specifically denying every allegation of Smith's petition concerning the alleged impropriety of denying parole and the alleged constitutional violations. The Governor also claimed that because he had final authority over parole decisions, courts lack authority to review the merits of his decisions.

On September 16, 2002, Smith filed his traverse. Among other things, he argued that the merits of the Governor's decision were subject to judicial review. He also argued that by failing to contest or answer his allegations about the blanket no-parole policy, the Governor conceded them.

On October 9, 2002, the trial court filed an *interim* order. The court cited recent newspaper articles indicating that after the Governor took office, there were 12,000 parole hearings, the Board granted parole in 140 cases, but the Governor let only two stand, both of which involved prisoners whose victims had battered them.[9] The court requested that Smith and the Governor submit additional or contrary statistical evidence.

Smith did so, submitting additional evidence that the Governor had still upheld parole in only two cases. The Governor, among other things, objected to the court's considering statistical information, asserting that it was irrelevant because parole decisions "must be based upon the individual circumstances of the offender and his offense."

Proceeding without an evidentiary hearing, the trial court issued its final order. It reversed the Governor's decision "because it is not supported by any evidence, it is the result of an illegal policy to block all paroles, and it violates the Ex Post Facto clause of the United States Constitution." First, the court concluded that the Governor's decision was subject to judicial review

---

S104701). It later reversed the appellate court. (*In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)

[9] The order attached articles from the San Francisco Chronicle that appeared on September 29 and October 7, 2002.

on the merits. Next, the court found that by failing to present argument or analysis in response to the allegations and evidence of a no-parole policy, the Governor conceded the issue. In this regard, the court accepted the statistical evidence reflected in the newspaper articles and corroborated in Smith's response to the interim order and found that it affirmatively established a no-parole policy for convicted murderers.

The court further found that at the time Smith entered his plea, the statute giving the Governor the power to review parole decisions did not exist. Thus, because the Governor has later used his statutory power only to reverse parole grants, the statute as applied "can only work to the detriment of inmates through longer sentences and greater punishment." The court concluded that this use of power violated the prohibition against ex post facto laws because it retroactively deprived Smith of a perceived benefit of his plea bargain: parole if and when the Board found him suitable.

Last the court concluded that because the Governor's decision was based on his no-parole policy, it could not be sustained even if there were some evidence to support it. In any event, the court further found that "[t]he Governor's conclusions are refuted by the evidence considered by the Board. There is no support of the Governor's position in the record of the hearing or in the opposition to the petition."[10]

## III. The Standard of Review

"The petitioner in a habeas corpus proceeding bears the ultimate burden of proving the factual allegations that serve as the basis for his or her request for habeas relief. [Citation.] Once the issues of fact have been joined by the respondent's filing of the return to the petition and the petitioner's filing of the traverse, the court may deny relief if it concludes that the petitioner has not alleged facts sufficient to warrant relief. [Citation.] If relief depends upon the resolution of disputed issues of fact, the court may order an evidentiary hearing and make findings of fact with regard to such issues. [Citation.] The various exhibits that may accompany the petition, return and traverse do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference. [Citation.] At the evidentiary hearing, such exhibits are subject to admission into evidence in accordance with generally applicable rules of evidence. [Citation.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 675.)

As noted, the court below did not conduct an evidentiary hearing but reached its decision based on the exhibits attached to the petition and return.

---

[10] The court did not address Smith's claim that the Governor's decision was time-barred and thus void.

Under the circumstances, we shall independently review the record. (See *In re Serrano* (1995) 10 Cal.4th 447, 457 [41 Cal.Rptr.2d 695, 895 P.2d 936]; *Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

In *Rosenkrantz, supra*, 29 Cal.4th 616, the California Supreme Court addressed the judicial review standard that applies to parole decisions by the Board and the Governor. The court first held that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658, italics added.) The court further held that "courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the Board to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by *some evidence* in the record that was before the Board." (*Id.* at p. 667, italics added.)

Concerning the "some evidence" standard, the court explained, "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

## IV. Discussion

### A. The Alleged No-parole Policy

We first address the trial court's finding that in reversing the Board's decision, the Governor applied a blanket no-parole policy and therefore did not engage in an individualized consideration of the factors concerning parole suitability.

We are guided by *Rosenkrantz.* There, the Board found Rosenkrantz suitable for parole. However, as here, the Governor reversed the Board, and Rosenkrantz sought habeas corpus relief. After an evidentiary hearing, the trial court found that the Governor applied a no-parole policy. The court based its finding on an article in the Los Angeles Times by David Lesher, quoting statements by the Governor to the effect that convicted murderers should serve life terms without exception. The court also based its finding on statistical evidence concerning the Governor's responses when the Board has granted parole. The evidence revealed that from January 1999 through April 2001, the Board held 4800 parole hearings, granting parole to 48 prisoners, and the Governor reversed 47 of these grants. Since April 2001, the Governor affirmed one more grant of parole by the Board. Both instances involved women who murdered husbands who had been abusing them. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 684–685.)

The California Supreme Court found this evidence insufficient to show a no-parole policy. The court noted, "Even if the quotations in the above newspaper article accurately reflected the views the Governor held at the time the statements were made, the Governor's subsequent actions, both in granting parole in some instances and in providing individualized analyses for each of his parole decisions in the cases that have come before him, belie the claim that the Governor has adopted a blanket policy of denying parole without regard to the circumstances of the particular case." (*Rosenkrantz, supra,* 29 Cal.4th at p. 685.)

The court further found that the evidence did not indicate that "the Governor's actual decisions reversing grants of parole by the Board failed to engage in an individualized consideration of the factors concerning parole suitability, or that the decisions themselves reflected or relied upon any blanket policy of denying parole to all murderers. The circumstance that the Governor has reversed most of the Board's decisions granting parole does not establish that he follows a blanket policy of denying parole or that his decision in the present case was based upon such a policy, rather than upon a consideration of the factors and evidence discussed in the Governor's lengthy written decision denying petitioner parole. Such reversals simply may indicate that the Governor is more stringent or cautious than the Board in evaluating the circumstances of a particular offense and the relative risk to public safety that may be posed by the release of a particular individual." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 685–686.)

Here, the trial court based its no-parole finding, in part, on the very same evidence rejected by the Supreme Court in *Rosenkrantz.* Thus, it no more supports a finding here than it did there. Moreover, in light of the Supreme Court's reasoning, quoted above, the trial court's reliance on the findings of

fact and conclusions of law made by the trial court in *Rosenkrantz* and a more recent newspaper article, of which the court took judicial notice, is misplaced.

The trial court also based its no-parole policy finding on other exhibits submitted by Smith. These exhibits included a memorandum, in which Smith accused the Governor and the Board of a variety of tactics and procedures designed to deny parole to convicted murders. In particular, he asserted that the Governor postpones filling vacancies on the Board to delay parole hearings and then stacks the Board with politically like-minded appointees who disfavor parole and will implement a no-parole policy. He accused the Board of preventing prisoners from being able to respond to letters opposing parole, inadequately compensating and overburdening appointed counsel, and using generic boilerplate "to find all such prisoners unsuitable for parole irrespective of how compelling for parole their records may be . . . ." Smith further alleged that the Board's Decision Review Committee disapproves over half of the Board's parole grants, and the remainder are referred to the Governor, who either reverses or remands virtually all of the rest. Conversely, the Governor does not review any decisions denying parole.

Smith also submitted a declaration signed in March 1999 by Albert M. Leddy, chairman of the Board from 1982 to 1992, stating that during that period, then Governor Pete Wilson had a no-parole policy and as a result the number of parole grants declined due to political pressure and new appointees who disfavored parole. In addition, Smith submitted an excerpt from a 2000–2001 report from the Legislative Analyst's Office, which infers a no-parole policy from the Governor's public statements and failure to explain statistical information showing a reduction in parole releases from 1989–1999.

These additional exhibits add no support to the trial court's finding. The procedures Smith outlined in his memorandum, former Governor Wilson's record, and the speculative inference by the Legislative Analyst's Office have little, if any, probative value concerning whether in this case, the Governor automatically reversed the Board and thus did not give Smith individualized consideration. This is especially true, given the Governor's written decision, which does not mention or refer to a no-parole policy but which discusses Smith's commitment offense, social history, and background of drug abuse, all of which are factors that are relevant in determining suitability. Moreover, where, as here, the Governor generally and specifically denied the factual allegations implicit in material submitted with Smith's petition, we question whether it was proper or appropriate for the trial court to rely on Smith's exhibits in the absence of an evidentiary hearing and a determination of their admissibility.

█ In sum, we conclude that the record does not support the trial court's no-parole finding.

## B. The Ex Post Facto Violation

In light of our conclusion, the trial court's finding that application of the no-parole policy violates the ex post facto clause necessarily fails. The finding fails for another reason as well.

In *Rosenkrantz*, the high court rejected the notion that the way the Governor exercises authority under article V, section 8, subdivision (b) of the California Constitution to reverse parole grants could violate the ex post facto clause. The court observed that before the provision was enacted, a person convicted of second degree murder could reasonably expect only that he or she would receive a sentence of 15 years to life and that after serving the minimum term he or she would be entitled to have a public official exercise discretion concerning his or her suitability for parole. However, such a prisoner would have no reasonable expectation regarding who would exercise discretion. The new constitutional provision merely changed the parole *procedure* by adding a new level of review within the executive branch. Accordingly, the provision did not interfere with a prisoner's expectations concerning parole or constitute an increase in his or her punishment for the commitment offense in violation of the ex post facto clause. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 640–641, 650–651.)

The court acknowledged that where the Governor exercises authority under the provision *to reverse* a grant of parole by the Board, the net result is that the prisoner will spend more time incarcerated than he or she would have before the provision was enacted. (*Rosenkrantz, supra*, 29 Cal.4th at p. 649.) However, that such situations may arise does not render the procedural change invalid under the ex post facto clause. In reaching this conclusion, the court distinguished *Garner v. Jones* (2000) 529 U.S. 244 [146 L.Ed.2d 236, 120 S.Ct. 1362] (*Garner*), on which the trial court here placed primarily reliance.

In *Garner*, the United States Supreme Court held that a new provision permitting the postponement of parole hearing dates did not violate the ex post facto clause because the provision *on its face* did not show a significant risk of prolonging the punishment of those who committed their offenses before the provision was enacted. (*Garner, supra*, 529 U.S. at pp. 250–251, 255.) The court explained that to establish a violation of the ex post facto clause under these circumstances, such a prisoner would have to show that the provision as applied created a significant risk of increasing punishment after the fact. (*Id.* at p. 255.)

The *Rosenkrantz* court distinguished the statutory provision in *Garner* from that here, opining that while a provision reducing the frequency of parole hearings is at least potentially comparable to a provision that increases the minimum term of a sentence and thus within the purview of the ex post facto clause, a procedural provision that merely changes the identity of the decision maker is not so comparable. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 650–651.) The court also rejected an argument that as applied, the procedural provision here violated the ex post facto clause. As the court stated, "[P]etitioner makes much of the circumstance that the record in this case establishes that the current Governor has utilized the authority afforded by article V, section 8(b), to deny parole in a large number of cases in which the Board has determined that the prisoner is suitable for parole. But the circumstance that in a significant number of cases a particular Governor may reach a judgment different from that of the Board, with regard to a prisoner's parole suitability, does not provide any support for the claim that the application of article V, section 8(b), violates the ex post facto doctrine. A similar reduction in the numbers or percentage of prisoners who are granted parole might well result from a change in the composition of the members of the Board itself, but petitioner does not—and properly could not—suggest that such a change in the Board's composition or in the person holding the office of Governor would raise any ex post facto question. As already noted, an individual who commits a crime has no reasonable expectation that his or her suitability for parole will be determined by the particular individuals who happen to exercise authority over parole decisions at the time the individual commits the crime. Accordingly, the circumstance that the Governor, in reviewing the Board's decisions, frequently may disagree with the Board's determination that a prisoner is suitable for parole, does not transform the review procedure of article V, section 8(b), into an unconstitutional ex post facto law." (*Rosenkrantz* at pp. 651–652, fn. omitted; see *In re Capistran* (2003) 107 Cal.App.4th 1299, 1307 [132 Cal.Rptr.2d 872] [rejecting claims of blanket no-parole policy and ex post facto violation in light of *Rosenkrantz*].)

### C. **Evidence to Support the Governor's Decision**

Given our analysis and conclusion concerning the alleged no-parole policy, we proceed to the central issue before us: Is there *some* evidence to support the Governor's decision.

As noted, the Governor concluded that Smith was not suitable for parole because he would pose an unreasonable risk of danger to society if released at this time.[11] The Governor based this conclusion on a combination of

---

[11] The Governor's order expressly states that Smith "still poses a danger to public safety." Because the Governor reversed the Board's finding that Smith *did not* pose an "unreasonable

factors: the gravity of the offense, Smith's history of past violence against his wife, his unstable social history and findings that his propensity for violence cannot be adequately predicted, and that he requires additional anger-management and substance-abuse counseling and treatment.

■ We first turn to the Governor's reliance on the gravity of the commitment offense. A conviction for murder does not automatically render one unsuitable for parole. (See *Rosenkrantz, supra*, 29 Cal.4th at p. 683.) Rather, the Regulations reveal that the gravity of an offense tends to show unsuitability where the circumstances of the crime distinguish it as *especially* grave.

To guide this determination, section 2402, subdivision (c)(1) of the Regulations focuses attention on whether the offense was committed "in an especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1).) To explain what that means, the Regulations list specific considerations: the crime involved multiple victims; it was committed in a dispassionate and calculated manner, such as an execution; the victim was abused, defiled or mutilated; the killing involved "*exceptionally* callous disregard for human suffering"; and the motive for the crime was either "inexplicable" or "trivial in relation to the offense." (Regs., § 2402, subd. (c)(1)(A)–(E), italics added.)

Here, the Governor opined that Smith's offense was a "callous crime."

■ Second degree murder requires express or implied malice—i.e., the perpetrator must kill another person with the specific intent to do so; or he or she must cause another person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for life. (§§ 187–189; see CALJIC No. 8.11.) For this reason, it can reasonably be said that *all* second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. (See Webster's Third New International Dict. (3d ed. 1993) p. 319, col. 1.) ■ As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable. Presumably, therefore, in calling defendant's crime callous, the Governor was invoking the suitability factor in

risk of danger" at this time, we read his written statement as a finding that Smith still poses *an unreasonable risk of danger* if released at this time. Our reading is in accordance with both article V, section 8, subdivision (b) of *California Constitution, under which the Governor is bound by* "the same factors which the parole authority is required to consider" (Cal. Const., art. V, § 8, subd. (b)), and section 2402, subdivision (a) of the Regulations, which provides that the prisoner shall be found unsuitable if the Board finds that "the prisoner will pose an unreasonable risk of danger to society if released from prison." Moreover, as noted, the Governor's new constitutional power of review is an additional level of review within the executive branch and not a change in the *standards* governing suitability. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 640–641, 650–651.)

section 2402, subdivision (c)(1)(D) and finding that Smith killed Garner in a manner that showed "exceptionally callous disregard for human suffering." (Regs., § 2402, subd. (c)(1)(D).)

█ However, the Governor does not specify how Smith manifested exceptionally callous disregard for Garner's suffering. There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured Garner before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. Rather, the Governor's version of the offense and the record reveal that Smith wanted to go job hunting, but Garner said she had other plans. He became suspicious and very emotional, and when she further announced the neither she nor anyone else wanted to see him, he immediately got his gun and shot her three times in the head, presumably killing her instantly.[12] Was the crime callous? Yes. However, are the facts of the crime some evidence that Smith acted with exceptionally callous disregard for Garner's suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No. (Cf. *In re Smith* (2003) 109 Cal.App.4th 489, 504, 506 [134 Cal.Rptr.2d 781] [no evidence that crime especially heinous, etc.].)

We acknowledge that the record contains some evidence that defendant's probation officer and prison staff counselor shared the Governor's view that the crime was callous. In defendant's 1980 probation report, the probation officer checked certain of the aggravating factors enumerated in the California Rules of Court for sentencing, specifically that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or *callousness.*" (Cal. Rules of Ct., rule 4.421, subd. (a)(1), italics added.) Later, in 1999, defendant's staff counselor reiterated the probation report, asserting that the crime reflected "viciousness, cruelty, and *callousness.*" (Italics added.) However, like the Governor's decision, neither the probation report nor the counselor's evaluation specify what it was about the offense that reflected exceptionally callous disregard for Garner's suffering.

█ As noted, the Governor also observed that the crime was not an isolated incident, but rather the culmination of "a continuing pattern" of personal drug use, social instability, and violence against Garner.[13] The

---

[12] The Governor's rendition of the crime is even briefer: "On the morning of May 22, Mr. Smith asked Ms. Garner if she was seeing someone else. She stated that she was and that she wanted nothing more to do with him. According to Mr. Smith, he 'couldn't take any more of this anxiety' and took his .22 caliber revolver from a dresser drawer and shot Ms. Garner in the head three times, killing her."

[13] Section 2402, subdivision (c)(3) of the Regulations lists having an "unstable social history" as a factor tending to show unsuitability and explains this to mean that "the prisoner

record supports this observation. However, the observation is more historical backdrop than a reflection of the circumstances surrounding commission of the offense: its manner, scope, and motivation. Indeed, there is no evidence that Smith shot Garner while he was under the influence, and no evidence that he abused her immediately before the shooting or even during the days and weeks before it. Thus, the Governor's observation does not tend to distinguish Smith's offense as especially grave.

Nevertheless, section 2402, subdivision (b) of the Regulations explains that "[c]ircumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b).) Thus, the Governor's finding of a *pattern* supports his reliance on the gravity of the offense to show unsuitability.

■ The record also supports a finding that Smith's offense was aggravated. As aggravating factors, defendant's 1980 probation report listed the fact that Smith used a gun, Garner was particularly vulnerable, and the planning, sophistication, and professionalism with which Smith killed Garner indicated that it was premeditated.[14] (Cal. Rules of Court, rule 4.421(a)(2), (3) & (8).) Similarly, Smith's 1999 Life Prisoner Evaluation also lists as aggravating factors that Smith had an opportunity to stop his crime but continued, and he had a special relationship of trust with Garner. The Board similarly considered the crime aggravated by the fact that Smith had a special relationship to the victim, she was particularly vulnerable, Smith engaged in an ongoing pattern of physical and mental abuse, and he had an opportunity to stop his crime but instead continued. There is some evidence to support these aggravating factors. Thus, they and the pattern finding support the Governor's reliance on the gravity of Smith's offense to show unsuitability.

We next turn to the Governor's finding that given Smith's "deep-rooted pattern" of social instability, drug use, and violence against Garner, his "propensity for violence in the free community cannot be adequately predicted at this time." Additionally, the Governor observed that although Smith has received counseling in spousal abuse and anger management, the "gains made in these areas are recent," and therefore he "requires additional counseling and more time to demonstrate that he can maintain these gains outside of an institutional setting."

has a history of unstable or tumultuous relationships with others." The record reveals that Smith had unstable and tumultuous relationships, especially with his father and stepfather and Garner.

[14] Presumably, the last aggravating factor was based on the threat defendant communicated to the minister about killing Garner if she returned to California.

There is no evidence that Smith's "propensity for violence" *cannot* adequately be predicted at this time, and the Governor omits reference to or consideration of uncontradicted evidence refuting his view.

In 1999, two years before the Governor's decision, the staff psychologist analyzed Smith's background, including his drug use, social history, and violence toward Garner, and concluded that at that time, his "potential for violence in the community is in the low end of the average range and would continue to decrease with time." The psychologist also indicated that Smith's violence toward Garner arose from displaced rage due to his experience of rejection and the fact that he married a person who was likely to trigger feelings of rejection.

The psychologist's opinion of Smith's current potential for violence was shared by Smith's correctional counselor, who, in 1999, similarly concluded that Smith "would probably pose a low degree of threat to the public at this time if released from prison." He further noted that Smith "has continued to remain disciplinary free and has displayed a positive institutional adjustment since his incarceration."

These opinions find support in the fact that Smith's "propensity for violence" was focused on only one person and manifest for only two years. Thus, despite social instability and drug use since he was a boy, Smith did not act violently until after he married Garner, and then his propensity for violence was directly solely toward her. In this respect, we further note that there is no evidence of any violent or even antisocial conduct during the next 22 years of Smith's incarceration.

Moreover, there is no evidence concerning Smith's attitude and conduct *after 1999* that might reasonably undermine the psychologist's and counselor's implicit conclusions that Smith's propensity for violence could adequately be gauged and their opinions that his potential for future violence was low. Rather, the record reveals that since 1999, Smith's attitude, conduct, and active involvement in various educational, volunteer, and therapeutic activities during this period continued to be exemplary.

Finally, the record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and counselor concerning Smith's dangerousness. In the absence of such grounds or other evidence, the Governor's view that Smith's propensity for violence cannot adequately be predicted at this time is unsubstantiated speculation and as such appears to be arbitrary and capricious. (See *Rosenkrantz, supra,* 29 Cal.4th at p. 665 [decision without any evidentiary support is arbitrary and capricious].)

Next, there is no support for the Governor's view that Smith has only *recently* shown progress in his therapy for spousal abuse and anger management and, therefore, he "requires" additional counseling in the prison setting in order to demonstrate that he can maintain his recent gains in society.

As noted, Smith participated in therapy for almost 15 years, nine years of which involved a process group for spouse killers. There is no evidence that until recently Smith denied abusing Garner or that until recently he made little or no progress in understanding its causes. The 1999 psychological evaluation states that by then Smith had already "completed a very positive level of programming since his period of incarceration." In 2000, the psychologist who led Smith's process group reported that his participation and amenability to treatment was good, he scored a high evaluation, and his need for further treatment was low. Although *the dates* of these reports may be considered recent relative to the Governor's decision, neither contains any evidence suggesting that Smith had only recently attained his current level of awareness and understanding or that he needs to remain incarcerated for further counseling.

Last, the Governor concluded that Smith was unsuitable for parole because he needs more drug treatment and counseling in the prison setting. The Governor based this conclusion on Smith's long-term drug use, the inference that Smith's desire for drugs during that time was deeply entrenched, and the possibility that if released Smith might start using drugs again and engage in violent criminal conduct.

As noted, a determination of unsuitability is simply shorthand for a finding that a prisoner currently would pose an unreasonable risk of danger if released at this time. (Regs., § 2402, subd. (a).) The Governor's reasoning implies a finding that there are reasonable grounds to believe that Smith *would* start using drugs again if released at this time.

The record reveals that Smith abused drugs for many years before he ever became violent toward anyone. Then, during their two-year marriage, Smith was violent toward Garner. However, there is no evidence that his violence was primarily drug-induced, and, as noted, he was not under the influence when he killed Garner. Moreover, although Smith's drug use may have contributed to the circumstances under which he abused Garner, the staff psychologist explained that his violent conduct primarily sprang from psychological, emotional, and social issues related to his childhood and the fact that he married the type of person who would trigger his unresolved feelings of rejection and abandonment.

Under the circumstances, the record does not reasonably establish a strong causal connection between Smith's use of drugs and his violent

criminal conduct. Consequently, we conclude that Smith's *past* desire for and use of drugs does not by itself reasonably establish current unsuitability because there is no additional evidence to complete a chain of reasoning between his past drug use and a finding that because of it he currently poses an unreasonable risk of danger if released. In other words, in the absence of some evidence to support a reasonable belief that Smith *might* start using drugs again, the fact that he used drugs extensively more than 20 years ago does not by itself represent some evidence that he is currently dangerous.

Moreover, here the record does not contain any evidence to support reasonable grounds to believe Smith might start using drugs if released. There is no evidence that Smith's former desire for drugs might still be a motivating force. The record reveals that he has been clean and sober for a substantial period of time relative to the duration of his abuse. There is no evidence that Smith denies he had a drug problem or denied he had a problem for some period of his incarceration. There is no evidence that he refused, failed, or did poorly in drug treatment programs. And there is no evidence that Smith ever used any type of illicit substance during his incarceration. Nor does the record support a reasonable belief that without further drug treatment *in prison*, Smith might start taking drugs again. Indeed, the Governor neither refers to nor considers in his decision the undisputed evidence before the Board that is inconsistent with a finding that Smith needs more treatment in prison or that he might start using drugs again if released.

In his 1999 report, Smith's correctional counselor opined that the key to Smith's success on parole lay in his ability to avoid drugs and alcohol. He further stated, "It is not unreasonable to believe that there is an element of unpredictability that would pose a degree of threat to the community should he resume his addictive lifestyle." Thus, in 1999, the counselor believed that before being released, Smith "could benefit by continuing his present program, remaining disciplinary free, participate in self-help/therapy groups, and continue his involved [*sic*] in Alcoholics Anonymous and Narcotics Anonymous 12-step process by working the steps and practicing them daily." Nevertheless, the counselor concluded that if Smith were released in 1999, he would pose a low degree of threat to the public. Moreover, Smith continued his therapy and treatment programs and remained disciplinary free after 1999.

The staff psychologist opined that Smith's drug problem was in remission and that Smith no longer sees drugs as desirable. Furthermore, the record reveals that Smith has long admitted having a substance abuse problem and embraced treatment in prison. Rather, he participated in Alcoholics Anonymous for 14 years and Narcotic Anonymous for three and a half years. He had also completed three substance abuse groups, with each one lasting eight weeks. Moreover, he was a group leader in his 12-step program, he planned

to continue to attend Alcoholics Anonymous and/or Narcotics Anonymous groups for support upon being released, and he had correspondence with a local group, where he hopes to become a group sponsor. As the court in *Rosenkrantz* observed, "[A]lthough the state expects prisoners to behave well in prison, the absence of serious misconduct in prison and participation in institutional activities that indicate an enhanced ability to function within the law upon release are factors that *must* be considered *on an individual basis* by the Governor in determining parole suitability." (*Rosenkrantz, supra*, 29 Cal.4th at p. 682, first italics added, second italics in original.)

■ In sum, the sole factor cited by the Governor—Smith's entrenched desire for drugs due to long-term abuse—does not constitute some evidence that Smith might start using drugs and become violent again, and therefore that he *currently* poses an unreasonable risk of danger without further treatment. Indeed, if Smith's past use of drugs did invariably establish his unsuitability, then the Governor could deny parole for the rest of Smith's life based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse, let alone a return to violent conduct as a result of it. Moreover, the Governor's conclusion that Smith currently would pose an unreasonable risk of violent criminal conduct if released without further drug treatment appears to be arbitrary and capricious because, as noted, his decision omits any consideration of, or even reference to, the undisputed evidence noted above.

■ In this regard, we point out that in *Rosenkrantz*, the court stated that to ensure due process, the Governor's decision *must* "reflect[] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards . . . ." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Here, however, the Governor's decision omits any consideration of relevant evidence and the numerous factors cited by the Board that tend to show suitability, including that Smith committed the crime while under stress, he has shown great remorse for the crime, his age makes him less of a potential threat, he has developed marketable skills, he has wide support and realistic plans for the future, and during his lengthy incarceration, he has long participated in drug treatment and psychotherapy and has devoted himself to self-improvement and volunteer work with other troubled prisoners. (Regs., § 2402, subd. (d)(3), (4), (7), (8), & (9).)

### D. Conclusion

■ We are particularly mindful that the Governor's decision is entitled to great judicial deference, and, therefore, we must not reweigh the evidence, resolve conflicts, or otherwise substitute our view of how the enumerated

factors concerning suitability are considered and balanced. (See *Rosenkrantz, supra*, 29 Cal.4th at p. 677.) However, we believe that our analysis remains well within the limits of our authority to determine whether there is some evidence to support the Governor's determination of unsuitability.

 We note that the Governor's decision is not based on alternative and independent findings concerning the callousness and gravity of Smith's offense, a pattern of social instability, drug use, violence toward Garner, the need for further anger management therapy, and the need for further drug treatment. (Cf. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Rather, he expressly based his decision on the unreasonable risk of danger posed by the combination of all of these factors. Thus, where, as here, the record does not contain some evidence to support some of his findings, we believe that his decision cannot stand. This is especially so here because the Governor's findings concerning Smith's need for more therapy and treatment in prison—the findings we find no evidence to support—are inherently more probative concerning whether Smith currently poses an unreasonable risk of danger than the Governor's other findings. Moreover, given the record before us, we are not confident that the Governor would have found Smith unsuitable for parole solely because of the gravity of the commitment offense and Smith's unstable background.

We turn now to the issue of the appropriate remedy. As noted, the trial court ordered Smith's immediate release. Although Smith is entitled to writ relief, we do not agree that the proper and appropriate remedy is an order directing his release.

In *In re Capistran, supra*, 107 Cal.App.4th 1299, the Board found Capistran suitable for parole, but the Governor reversed the Board, finding him unsuitable for parole due to a combination of factors. Capistran sought a writ of habeas corpus, and the trial court granted the writ and directed the Board to set a date for his immediate release. (*Id.* at pp. 1302–1304.) On appeal, the court reviewed the Governor's decision and found no evidence to support some of the reasons for his decision and that the decision failed to reflect an individualized consideration of specified criteria that tended to show suitability. (*Id.* at p. 1306.) Thus, because the Governor did not purport to rely exclusively on the factors for which there was some evidentiary support, the court concluded that the Governor's decision could not stand, and Capistran was entitled to writ relief. (*Ibid.*) However, the court disagreed with the trial court that Capistran was entitled to be released on parole at this time. The court explained, "In *Rosenkrantz*, the Supreme Court instructed that in cases where the Board's findings are not supported by the record, 'the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in

accordance with due process of law.' [Citation.] The Governor and the Board possess equal discretion in reviewing parole suitability [citation], so the Governor should be ordered to vacate his decision reversing the Board's decision and may thereafter proceed in accordance with due process." (*Id.* at pp. 1306–1307.) In its disposition, the court directed the trial court to order the Governor to vacate his decision. It then deemed the Board's original order reinstated as of the date of the trial court's order and opined that the Governor was free to issue a new decision pursuant to his authority to review actions by the Board. (*Ibid.*) We consider this approach to be both proper and appropriate under the circumstances.

We recognize that in *In re Smith, supra,* 109 Cal.App.4th 489, the court acknowledged the disposition in *Capistran* but declined to adopt it. The court pointed out that when a Board's decision is reversed, the Board can order a new suitability hearing. However, the Governor's parole review authority is limited by the material presented to the Board. In *Smith,* the court found no evidence in the record before the Board that could support a finding of nonsuitability. Consequently, the court opined that a remand to the Governor would be an idle act: He could not find Smith unsuitable for parole. Therefore, the court upheld the order directing Smith's release. (*Id.* at pp. 506–507.)

Here, we have limited our review to the question of whether there is some evidence to support the Governor's decision, and we find only that there is no evidence to support some of the factors on which the Governor based his determination. Under the circumstances, we decline to follow *Smith.*[15]

## V. Disposition

The trial court's order granting the petition for habeas corpus and directing Smith's immediate release is reversed. The matter is remanded to the trial court for entry of a new and different order directing the Governor to vacate his decision reversing the Board. The Board's decision shall be deemed reinstated as of the date of the trial court's order. Thereafter, the Governor, at

---

[15] Defendant also renewed his claim raised below that the Governor lacked jurisdiction to reverse the Board's determination and, therefore, his decision is void. Defendant bases this claim on sections 2041, subdivision (d)(2), and 2043 of the Regulations. However, whatever effect these regulations may have on the finality of the Board's decision vis-à-vis review by the Board's review committee, we do not find them jurisdictional in the fundamental sense with respect to the Governor's constitutional and statutory authority to reverse, modify, or affirm the Board's determination of suitability. Simply put, defendant cites no persuasive authority to convince us that the failure of an administrative agency to comply with a time requirement set forth in the Code of Regulations divests the Governor of jurisdiction to assert power granted under the Constitution.

his discretion, may review the Board's decision and issue a new determination under his constitutional and statutory authority and in accordance with the requirements of due process.

Rushing, P. J., and Mihara, J., concurred.