Filed 4/15/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDREW DAVE SHELTON on Habeas Corpus. | A154983 (Solano County Super. Ct. No. FCR334660) |

Andrew Dave Shelton, serving a life sentence for a 1991 second degree murder, petitions for a writ of habeas corpus after being denied parole in 2016, and again in 2018. He contends the Board of Parole Hearings (Board) failed to apply controlling legal principles in finding him unsuitable for parole. As we will explain, we agree that the relief he seeks—a new parole suitability hearing—is warranted.

## BACKGROUND

In 1993, Shelton was sentenced to a prison term of 19 years to life after pleading no contest to the second degree murder of his mother-in-law, Carol Tveisme, and assault with a firearm on her sister-in-law, Broje Tveisme. His minimum eligible parole date was February 18, 2004; the parole hearings in 2016 and 2018, were his fifth and sixth. Each of these hearings followed a prior three-year denial and was advanced to a hearing date earlier than the three years as a result of the administrative review process.

1

After Shelton filed a pro. per. petition for writ of habeas corpus challenging the parole denials, this court issued an order to show cause and appointed counsel to represent him. A supplemental petition was filed on February 19, 2019, followed by respondent's return and Shelton's traverse. While these proceedings were pending, Shelton appeared for another parole hearing on November 15, 2019, and was again denied parole. We denied Shelton's request to expand the order to show cause but stated that any effect of the 2019 parole denial would be addressed in disposing of the issues raised in the current pleadings.[1]

---

[1] Respondent's return argues that Shelton's challenge to the 2016 denial of parole is moot because any due process violation that occurred at the 2016 hearing would be redressed by our resolution of the challenge to the 2018 denial. The return further argues that the challenge to the 2018 denial should also be denied as moot because Shelton was scheduled for another parole suitability hearing on November 15, 2019. That hearing, as indicated above, has now taken place.

We disagree with respondent. As this case demonstrates, where an inmate's subsequent parole hearings are advanced as Shelton's last two have been, a new parole hearing may take place before this court has considered and decided a challenge to the last one. Were we to dismiss such challenges as moot, the Board's decision at a prior hearing would stand even if legally unsound, leaving the Board to repeat its errors at future hearings. "It is appropriate for an appellate court to exercise its discretion to retain and decide an issue that is technically moot where, as in this case, 'the issue is "presented in the context of a controversy so short-lived as to evade normal appellate review" [citations], or when it is likely to affect the future rights of the parties [citation].' (*Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 921.) A moot case may also be retained if, as also appears to be true in this case, the

2

*Pre-offense Background*

Shelton entered the military at age 17, after graduating from high school, and served from 1973 to 1991. The only instance of violence in his history was a bar fight early in his military service, which he said he did not instigate but responded to with violence. He served in active combat in various global locations, and reported having seen "horrible death, destruction" including rebels in the Congo "killing children, cutting babies out of women's stomachs." He received a Purple Heart and a Bronze Service Star, as well as other decorations including the "Army Service Ribbon/Oversea Service Ribbon, Professional Development Ribbon, Army Commendation Medal, Army Good Conduct Medal, Driver's Mechanic Badge, and National Defense Service Medal."

In 1990, Shelton suffered a traumatic brain injury when the tailgate of a five-ton truck was dropped on his head, after which he reported significant memory difficulties, had problems with getting lost, and suffered slurred speech. He also suffered back injuries when a helicopter he was in was shot down, and according to some of his accounts sustained head injuries in that crash.[2] He acknowledged abusing alcohol while in the military,

same controversy between the parties is likely to recur. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479–480; *Dobbins v. San Diego County Civil Service Com.* (1999) 75 Cal.App.4th 125, 128, fn. 3.)" (*In re Scott* (2004) 119 Cal.App.4th 871, 877, fn. 1.)

[2] The 2016 risk assessment report noted that in his interview, Shelton was "convinced" his only head injury in the

3

saying he never drank on duty but drank " 'hard' " on days off. He was honorably discharged in 1991, with a "100% disability for psychogenic amnesia."

Shelton married in 1980, and had two daughters, but his wife left him for another man shortly after the birth of the second child and then died in an airplane crash. He met Lori, his second wife, in Hawaii around the time of his discharge from the military. His daughters, then six months old and nine years old, were living with his sister in Texas. He and Lori moved to Fairfield, California and the children came to live with them, as did Lori's son. At this time, the army owed Shelton $64,000 in back pay.

Shelton's marriage to Lori was very brief. He reported that she had an alcohol problem and left the treatment program he put her in, and that she would throw things at him, hit him, threaten him with a bat or knife, and threaten to have him killed. Shelton denied hitting her, but stated at the 2018 hearing that he once "spanked" her to get her to stop what she was doing. Lori's mother, Carol, "talked ugly" to him, criticized, insulted, and belittled him.

Prior to the life offense, Shelton believed Lori and her family were trying to kill him. In a 1992 interview, he said that they were trying to kill him to get access to his disability payments, and that two men had followed him, entered his home with a gun and attempted to kidnap his children, Carol had

military was from a helicopter crash despite records of a 1991 psychological evaluation indicating the head injury resulted from being hit with the tailgate.

4

pointed a gun at him in September 1991, and days before the life offense, Lori had given him rat poison.[3] The 1993 presentence report related Shelton saying that six days before the life offense Lori threatened to have him killed, and the day before the offense, her friends attempted to kill him. At the 2016 hearing, Shelton said the men who came to his house were trying to hurt him, not to kidnap the children. At the 2018 hearing, however, when asked if he thought someone was trying to kill him, Shelton said, "No. See, the head injury kind of made me paranoid." At the 2019 hearing, Shelton described one man coming into his apartment with a shotgun; when asked why he did not call the police, Shelton said he forgot to call.

***The Life Offense***

At the time of the life offense, Shelton was 37 years old and had no prior criminal record. According to the police report, Shelton arrived at Carol's home, where Lori was then living, at 9:00 a.m. on December 11, 1991. After talking with Lori, Shelton went into Carol's office to talk with her and shot Carol once in the head and once in the neck with a .25 caliber semiautomatic pistol. The coroner subsequently concluded that either of the two shots could have caused Carol's death.

After the shooting, Shelton returned to the living room to talk to Lori. Lori went into a neighbor's apartment and locked the door "against [Shelton's] attempts to gain entry." Shelton

---

[3] According to Shelton, Lori put something on his food while they were eating in a restaurant and he subsequently swelled up and had to be taken to the hospital. He stated he was not allergic to anything.

shot three times into the door, and Lori jumped out a window and ran. Shelton went downstairs, grabbed Carol's sister-in-law Broje in a headlock, placed the gun to her chest, and dragged her to the south end of the apartment complex, where she managed to get away and ran to a neighboring apartment. As she ran, Shelton pointed the gun at her and counted to three, then put the gun to his head and pulled the trigger. He was arrested and taken to the hospital.

Shelton has always maintained Carol was shot accidentally. His basic account of the shooting has been consistent: After drinking several shots of vodka, he borrowed a gun from his daughter's babysitter[4] before going to Carol's apartment; he and Carol argued about money, then as he was leaving, he was hit on the head, the gun fell on the floor, she grabbed it, and in a struggle over control of the gun, it fired accidentally.[5] Details of the events and his motivations, however, have varied between his various forensic interviews and statements to the Board, as have details about his life.

Shelton has repeatedly stated that he borrowed the gun from his babysitter because of his belief that Lori and Carol wanted him killed and/or the attempts to kill him. But he told the psychologist who conducted his 2016 risk assessment

---

[4] At the 2019 hearing, Shelton acknowledged having had an affair with the babysitter.

[5] An exception to this consistency appears in a pro. per. petition to recall sentence dated January 31, 2018, in which Shelton referred to the life offense as the "impulsive murder of his mother-in-law."

evaluation he did not know why the babysitter gave him a gun the morning of the offense. At the 2016 hearing, Shelton at one point said he brought the gun to Carol's house because he thought the men who had come to his house would be waiting to ambush him; at another point said he did not know why the babysitter gave him the gun; and at yet another point he said the babysitter told him to take the gun because "those guys might be there." At the 2018 hearing, he did not remember having said he brought the gun because he thought the men who came into his house were going to be waiting for him; he said the babysitter gave him the gun after talking to him about Lori and he did not know why he took it. At the 2019 hearing, Shelton said the day after the man came to his apartment, he told the babysitter what had happened, she gave him the gun and told him to take it with him when he went to Carol's apartment, and he took it "for protection" because he thought he was going into a "trap."

Shelton went to Carol's on the morning of the offense after Carol called saying Lori was sick and asking Shelton to come and take her to the hospital. Although Shelton reported having stopped drinking after leaving the military, he drank three or four shots of vodka that morning. When he arrived at Carol's, Lori was not sick. They discussed signing divorce papers and Shelton giving Lori $25,000 from the $64,000 he had received from the Army. At the 2018 hearing, however, when asked where he was going to get the $25,000, Shelton said he was going to borrow it from his brother-in-law. At the 2019 hearing, Shelton said he did not know why he had referred to borrowing money

from his brother-in-law but explained that he was under a conservatorship; his sister and brother-in-law took care of his money and he would need them to withdraw money from the bank for him.

After the discussion with Lori, Shelton and Carol got into an argument about money. As Shelton attempted to leave, Carol hit him on the head; in some accounts he said she hit him with a hammer and in others that he did not know what she hit him with. He fell and the gun came out of his sock (as he told the probation officer in 1993 and psychologist in 2016) or back pocket (as he said at the 2016 and 2018 hearings).[6] Carol grabbed the gun and aimed at Shelton; at the 2018 and 2019 hearings, he said she "clicked" it, and the presentence report and 2016 risk assessment report relate him saying she clicked it but the gun did not fire. He leaped at Carol, causing both of them to fall against the wall, and the gun accidentally fired during the struggle. Shelton's description at the 2016 hearing was that he "rushed her and bent her hand back"; her hand was on the trigger and in the struggle the gun fired, hitting her in the neck and side of the head. Asked about the gun going off accidentally yet hitting the victim twice, Shelton said, "[y]ou've got a ten-round magazine in the . . . stock. And once you chamber the—chamber slider and a round goes up in there, if you just barely tough it, it will go off, especially if you're pulling the trigger. And it will go off twice. It won't go off no more."

---

[6] At the 2019 hearing, he did not remember whether the gun had been in his sock or in his pocket.

Shelton explained that he fired three shots into the neighbor's doorknob in an attempt to get in and explain to Lori what had happened.

Regarding the incident with Broje, as related in the presentence report, Shelton said he saw Broje as he was leaving and grabbed her in order to explain what had happened. He denied holding a gun to her, and said that after talking briefly with her, he shot himself in the head. At the 2016 hearing, he said that as he was crying and trying to explain what had happened, he "put [his] hand around" Broje, walked with her to the "south end" and let her go, and did not point the gun at her or chase after her. He denied trying to commit suicide when he shot himself in the head and, confronted with a report of his having said he shot himself out of despair and guilt, did not remember having said this. Noting that he "talk[s] with [his] hands a lot," Shelton said he was trying to explain to the police what had happened while holding the gun in his hand, and as he was demonstrating the struggle and the bullet hitting Carol's head, the gun "just went off." In contrast, the 2016 risk assessment report related Shelton having said that when he was trying to explain what happened to the police, he "thought they weren't gonna take the word of a black man . . . so I shot myself right there."

According to the 2016 risk assessment report, Shelton described a different sequence of events than in his other accounts: After the shooting, he first went to explain what

9

happened to Broje, who was scared and would not talk to him,[7] then went to find Lori and shot at the door knob when she would not open the door, and then went outside and encountered the police.

Although Shelton consistently insisted Carol was shot accidentally, he took responsibility for her death due to his having brought the gun that day. At the 2016 hearing, he said it was his fault "for having the gun." He said he was not mad when he went to the apartment to talk to Lori that day, although at another point, discussing how he would get angry in arguments with Carol, he said, "[t]he day I went over there, I got mad, I shot her." At the 2018 hearing, he said he took "full responsibility" for Carol's death even though it was an accident, and recognized that he "hurt a lot of people." He told the panel, "She didn't have no right to lose her life. She didn't have no right—I didn't have no right to do what I did. I betrayed that family." He took responsibility "[f]or everything. That I hurt my daughter's. I hurt the community. It's a good community, a nice community. I hurt the community. Lori Shelton's family, the Tveisme treasure family. . . . They lost their grandmother. The grandkids can't see their grandmother. They don't know who their grandmother was, for what I've done. And plus the community, the neighbors, and everybody else. I'd affected a lot of people." Again at the 2019

_____

[7] The report quoted Shelton saying he was "running around with my head cut off trying to tell [Broje] what happened. She was south I think, sun rises in the east and sets in west right? She was in the south. She was smoking in the south, outside. Told her what happened, she got all scared and wouldn't talk to me."

hearing, Shelton described the shooting as accidental but took responsibility for Carol's death because he brought the gun to her apartment.

### *Institutional Conduct*

During his more than 25 years in prison, Shelton received five rules violation reports. The most recent was in in 2011, for refusing a rehousing assignment; Shelton maintained he had no choice but to refuse because the prison intended to move him to a cell with an inmate who sold drugs and possessed a cellular phone. Earlier violations were for refusing a rehousing assignment and delaying a peace officer in 2009, sexual behavior in 2007, "conduct which could lead to violence" in 2005, and "Out of Bounds" in 2005. The 2005 and 2007 violations both involved an inmate named Blake. In 2007, the reporting officer observed the inmates kissing each other on the lips; Shelton denied the conduct. In 2005, the reporting officer heard a scream, then observed Shelton with his arms wrapped around Blake; Shelton said something like "you have my ring" or "give me back my ring,'" Blake said he did not have it and Shelton threw a punch. Shelton said he was horse-playing and surprised Blake but they were not fighting, and that he had left his ring after taking it off while shaving or showering, and Blake picked it up for him. Shelton denied ever having been in a relationship with Blake and said they were just friends.

During the early years of his incarceration, Shelton completed vocational training programs in painting and in refrigeration and air conditioning. He then trained as a hospice

11

volunteer in 2002 and 2003, and worked as a medical aide for many years. Laudatory "chronos"[8] in 2013 and 2014 "attest[ed] to his strong work ethic compassion, and desire to learn." He completed over 20 "Pastoral Care Services Advanced Trainings" from 2013 to 2015, and his work supervisor reports in that period were "mostly exceptional performance ratings." He was reassigned in October 2015, after he was reported to have "administered medical care without permission/supervision" while assisting an inmate to urinate; it was noted that he admitted "having feelings for the inmate." He continued to write pastoral care essays after being reassigned. He earned certificates of completion for training in palliative care and "nursing care of the older adult" in 2015, and was awarded a diploma as Health Care Aide in March 2016.

Shelton engaged in Alcoholics Anonymous (AA) throughout his years in prison and participated in veterans groups and various other self-help programs, including anger management and "Alternatives to Violence," earning numerous certificates of completion. As of the 2019 hearing, his work assignment was as a painter and he had two very positive chronos from supervisors.

In 2005, Shelton married a woman his sister wanted him to marry. The marriage lasted about a year, during which time the

---

[8] A "chrono" is an institutional documentation of information about inmates and inmate behavior. (See Cal. Code Regs., tit. 15, § 3000 [definition of "General Chrono"]. All further references to Regulations are to the California Code of Regulations, tit. 15 [Crime Prevention and Corrections], Div. 2 [Board of Prison Terms], § 2000 et seq.)

woman visited him every Saturday, and was then annulled. Shelton could not remember the woman's name.

In 2009, Shelton was placed in the Correctional Clinical Case Management Services (CCCMS) after he reported having been raped by 20 inmates and reported or was observed to have nightmares, difficulty sleeping, a quick startle response, social withdrawal, agitation, and beliefs that his problems with urination and constipation were due to the rape. While in CCCMS he reportedly disclosed two suicide attempts during his military service—cutting his wrists and overdosing on aspirin. He subsequently denied these were suicide attempts, saying he had been misunderstood when he described being injured on barbed wire while in the field, then taking multiple doses of aspirin due to the pain. Shelton's risk assessments reports state that he was removed from CCCMS in 2010 at his request, with a notation that depression and insomnia had not been apparent for six months. At the 2018 hearing, however, the commissioners stated that records showed he was in the mental health system; Shelton said he had not seen his psychiatrist in "a while" because she said he no longer needed to.

### Parole Plans

Shelton was pursuing plans to move into transitional housing, but also had the option of living at his brother-in-law's house; his sister had died by the time of the 2018 hearing but his brother-in-law remained ready to offer support. He was entitled to retirement and full medical benefits from the Department of Veterans Affairs (VA), as well as social security disability

benefits, and would not need to work for compensation, but he intended to volunteer as a health care aide at the VA or, if that did not work out, with programs helping the homeless. As of the 2019 hearing, he had just gotten his health care worker certificate. His "multi-page" parole plan included support people such as AA sponsors, his parole officer, and his mentor and pastor.

***Risk Assessment***

Shelton's most recent "Comprehensive Risk Assessment," from 2016, concluded he presented a low risk of violence. All but one of his prior evaluations had similarly assessed him as presenting a low risk of violence (2003, 2009, 2013); the one exception placed his risk at low to moderate (2006).

The psychologist who evaluated Shelton in August 2016, Dr. McManus, noted Shelton had "provided discrepant information about his adult life across evaluations" and stated this was "likely due to confusion and memory loss secondary to multiple traumatic brain injuries." Dr. McManus noted that "[d]isorganization in his thought process and executive functioning were evident throughout the interview." Shelton arrived one hour late due to difficulty finding the interview room, and admitted he frequently became lost. His speech was mildly slurred. Both remote memory and working memory appeared impaired, albeit not uniformly. He appeared to have significant difficulty remembering events from his military service and immediately following his discharge and "appeared to engage in some confabulation (describing events that occurred in his past

14

even though he was not convinced if the events actually occurred)." He showed "relative strengths" concerning good judgment and abstract thinking. Dr. McManus stated that "[d]espite some apparent cognitive difficulties, effective communication was reached by speaking slowly and clearly, using simple language, and offering to re-word questions as needed. Shelton appeared to give his best effort to answer all questions, and at times appeared frustrated and confused about having difficulties coming up with an answer. His participation appeared non-defensive, forthright, and fully cooperative."

According to Dr. McManus, despite the discrepancies in Shelton's reports regarding his head injury and the events during and after his military service, "evaluating clinicians (Board evaluations, military evaluation, multiple evaluations for competence to stand trial and criminal responsibility) have consistently concluded Shelton has not been lying/malingering" but rather that "he was compromised by neurological problems/confabulation, delusional thinking, or neurotic amnesia." In Dr. McManus's opinion, "neurological problems and confabulation appear to be the most likely explanation for his memory problems and the associated additional problems with his mental status."

Dr. McManus diagnosed Shelton with "Alcohol Use Disorder, In a Controlled Environment" "Major Neurocognitive Disorder, Mild, without behavioral disturbance," and

"Posttraumatic Stress Disorder."[9]  He noted that Shelton's neurocognitive disorder "may be following a progressive course toward Moderate levels of impairment (his mental status during the current evaluation appeared markedly more impaired compared to his status during the 2013 evaluation).  This could lead to the future development of problems with anterograde memory and executive functioning that could impair his ability to independently care for himself."  With respect to the alcohol use disorder, Dr. Manus reported that Shelton demonstrated "internalization of multiple positive aspects of a substance use relapse prevention plan" and "a good knowledge of the tenets of Alcoholics Anonymous," did not underestimate the possibility he would be tempted to drink in the community and was aware of his individualized triggers.

In assessing Shelton's risk for violence, Dr. McManus stated, "it is clear that a major disorder of thinking has been present since at least 1991.  With the exception of the life crime, this disorder does not appear to have a relationship to violent or erratic behavior, as he has demonstrated non-violent and stable behavior during his incarceration."  Dr. McManus stated that Shelton's motivations for the life crime remain "unclear due to his

---

[9] Shelton had been diagnosed in 1997 with "Psychogenic Amnesia (suspected), Organic Mental Disorder (rule out) and Alcohol Abuse"; in 2003 with psychogenic amnesia and alcohol abuse; in 2006 with "Cognitive Disorder Not Otherwise Specified—possible amnesia/dementia, and Alcohol Abuse (rule out); in 2009 with "Cognitive Disorder Not Otherwise Specified and Alcohol Abuse (rule out)"; and in 2013 with "Delusional Disorder, Dementia due to head trauma (provisional), Alcohol Abuse, Adult Antisocial Behavior."

confabulation of events around that time. It is likely his mental disorder combined with disinhibition due [to] his use of alcohol that morning contributed to his violent behavior." It was noted that the "potential effects of stress" on Shelton's disorder should be "closely monitored/managed during a transition to the community," and his history of substance use considered.

Dr. McManus stated that Shelton was empathic and "has not presented with persistent antisociality. His total PCL-R score is *far below* the mean of North American male inmates and *below* the cutoff or threshold commonly used to identify dissocial or psychopathic personality." It was "unlikely his neurocognitive disorder will improve in the future" and "more likely that the symptoms will worsen with age." While there had not been a connection between the disorder and violence in prison, "the possibility remains for a repeat of the overwhelming confusion, and fearfulness he experienced the last time he attempted to reintegrate into the community." "With regard to insight, it is unlikely that his disorder will ever allow him to give a coherent narrative about his motivations at the time of the crime. This lack of insight does not appear to have led to violent outcomes in prison but during a transition to the community, his lack of insight would warrant consideration. However, violence risk could likely be managed without full insight into the life crime, as long as he possesses insight into the vulnerabilities that would be most likely to lead to his use of violence (substance use, mental disorder, poor stress response, interpersonal needs)." Dr. McManus noted that while Shelton made statements

accepting full responsibility and acknowledging his fault for carrying a gun on the day of the life offense, his description of the events "portrayed himself as a passive victim of a family who were harassing and attacking him" and he "did not appear to have given much consideration to the pain and fear his victim must have experienced or to the effects on her family."

With respect to elder parolee considerations, Dr. McManus observed that Shelton's medical conditions included two viral illnesses, a history of chronic back and knee pain and permanent visual impairment, as well as neurological impairment that might be "of a progressive nature which could eventually include symptoms of dementia." "A progressive neurological condition would likely diminish his physical strength and his capacity to effectively plan violence. However, his ability to independently ambulate does not entirely rule out his potential to engage in less planned/sophisticated violence." Noting that Shelton had no significant violent interactions in prison and minimal rules violations reports, Dr. McManus stated that "[t]hese positive behavioral patterns were likely influenced by the normal aging process and the effects of long-term confinement to some degree."

Dr. McManus felt Shelton's key risk factor for violence was his neurocognitive disorder and therefore the key risk management target was his ability to understand and manage his condition in the community. Commenting upon the "problems with insight, empathy and acceptance of responsibility" discussed in the evaluation, and lack of understanding of the motivation for the offense, Dr. McManus stated, "Most likely, we will never be

able to come up with the whole story of what occurred on the day in question." He explained that Shelton's lack of empathy for the victim could be "a by-product of the confusion he was experiencing at the time, which appeared to be at the level of intensity similar to a delusion" or "due to true hatred and hostility," but in either case "it is important to note these insight-related problems do not appear to be present for him in any other domains of his life. His few rules violations in prison do not appear indicative of antisociality though they do show some poor judgment in regard to his intimate relationships in prison. In general, he appears to have a pro-social worldview. In sum, his violence risk appears to have the potential to be effectively managed by proper monitoring, treatment and management of his mental disorder in combination with a strong network of support persons, AA, [VA], and other community programs." Dr. McManus concluded Shelton presented a "low" risk for violence, with "non-elevated risk relative to long-term inmates and other parolees. Low-risk examinees are expected to commit violence much less frequently than all other parolees."

***Physical Condition***

Shelton was 61 years old at the time of the 2016 hearing, 64 years old in 2019. He had been designated permanently mobility impaired in 2003 and was also designated permanently blind/vision impaired. At the 2016 hearing, he stated that he had trouble maintaining his balance when walking and would sway and fall backward, and he had an ADA worker to help him back to his cell after the hearing. At the 2018 hearing, he reported

that he had had two back surgeries and a knee replacement, and was taking 60 milligrams of morphine twice daily for pain. He wore "special shoes" and had a restriction against lifting. At his doctor's recommendation, he was trying to walk without a cane, and he was trying to go up and down stairs to regain strength in his legs and back, which he could manage if he moved slowly. At the 2019 hearing, Shelton was walking with a cane but trying to stop using it, and reported that the compression in his back would hurt if he sat too long. He reported that he was blind in one eye, apparently as a result of the self-inflicted gunshot during the life offense, although he said his eyesight was failing before the shooting.

## DISCUSSION

" 'Section 3041 mandates that the Board " ' "normally" ' " set a parole date for an eligible inmate, and " 'must'" do so unless it determines that an inmate poses a current threat to public safety. ([*In re*] *Prather* [(2010) 50 Cal.4th [238,] 249 [(*Prather*)], quoting ([*In re*] *Lawrence* [(2008)] 44 Cal.4th [1181], 1202 [(*Lawrence*)]. [Fn. omitted.] As a result, parole applicants have "a due process liberty interest in parole" and " 'an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' " (*Lawrence,* [at pp.] 1191, 1204.) In other words, " 'parole is the rule, rather than the exception' " (*id.* at p. 1204, quoting *In re Smith* (2003) 114 Cal.App.4th 343, 366), and "the onus [is] on the Board to justify denial of parole . . ." ([*In re*] *Shaputis*

20

[(2011)] 53 Cal.4th [192,] 222 [(*Shaputis II*)] (conc. opn. of Liu, J.)).' " (*In re Morganti* (2012) 204 Cal.App.4th 904, 915–916, quoting *In re Young* (2012) 204 Cal.App.4th 288, 301 (*Young*).)

" ' "We review the Board's decision under a 'highly deferential "some evidence" standard.' " ([*Young, supra*]*,* 204 Cal.App.4th [at p.] 302, quoting [*Shaputis II, supra,*] 53 Cal.4th at p. 221.) "[T]he appellate court must uphold the decision of the Board or the Governor 'unless it is arbitrary or procedurally flawed,' and it 'reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.' (*Shaputis II*, at p. 221.) 'The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence.' (*Ibid*.) At the same time . . . the Board's decision must ' "reflect[ ] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." ' (*Shaputis II*, at p. 210, quoting [*In re*] *Rosenkrantz* [(2002)] 29 Cal.4th [616,] 677, and citing *Lawrence, supra,* 44 Cal.4th at p. 1204, and [*In re Shaputis* (2008)] 44 Cal.4th [1241,] 1260–1261 [(*Shaputis I*)].)" ([*In re*] *Stoneroad* (2013) 215 Cal.App.4th at p. 616.) We are required to affirm a denial of parole "unless the Board decision does not reflect due consideration of all relevant statutory and regulatory factors or is not supported by a modicum of evidence

21

in the record rationally indicative of current dangerousness, not mere guesswork." (*Ibid*.)

'The nexus to current dangerousness is critical. "*Lawrence* and *Shaputis I* 'clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' (*Prather*, [*supra,* 50 Cal.4th] at pp. 251–252.)" (*In re Stoneroad, supra,* 215 Cal.App.4th at p. 615.) " 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public.' (*Lawrence,* [*supra*, 44 Cal.4th] at p. 1212, italics added.) The Board 'must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record.' (*Prather*, . . . at p. 255, italics added.)" (*Young, supra,* 204 Cal.App.4th at p. 303.) " '[T]he proper articulation of the standard of review is whether there exists 'some evidence' demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence,* . . . at p. 1191.)' ([*Prather*], at pp. 251–252.)" (*Shaputis II, supra,* 53 Cal.4th at p. 209.)' " (*In re Poole* (2018) 24 Cal.App.5th 965, 972, quoting *In re Perez* (2016) 7 Cal.App.5th 65, 84–85 (*Perez*).)

22

When the Board denied Shelton parole in 2016, it concluded he posed an unreasonable risk to public safety primarily because it found his version of the offense "defie[d] logic" and his continued view of it as accidental "hampered [his] ability to come to terms with this crime, and to accept responsibility for it." Noting Dr. McManus's statements that Shelton's lack of empathy for the victim could be a "by-product of the confusion he was experiencing at that time, which appeared to be at the level of intensity similar to a delusion" or "due to true hatred and hostility" toward the family, the presiding commissioner told Shelton he needed to explore more deeply "to see if there was hatred and hostility to the point of committing murder." Shelton was told he needed to "look at this from a different angle," that his professed acceptance of responsibility did not clarify the motivation for the crime, and that "if you haven't come to terms with the actual murder, then you haven't zeroed in on what the problem is, so therefore, you haven't been able to fix the problem, because you don't have an understanding of why it occurred."

The panel in 2018 similarly found Shelton continued to pose an unreasonable risk of danger to society because it found his explanation of the offense implausible, had trouble believing Shelton because his accounts varied, and felt Shelton did not understand the magnitude of the crime and impact of his actions on his victims. The panel told Shelton there was "really not much difference" from 2016, when he was denied parole "for

basically a lack of insight and lack of remorse," and he needed to look at his offense "honestly."

In 2019, the panel found Shelton continued to have "problems in the area of understanding and or taking responsibility for his violent actions, both during the li[f]e crime and . . . during his incarceration." The panel's decision referred to his minimizing of his actions and lack of credibility in describing Carol's death as accidental, and expressed concern that he lacked understanding of risk factors associated with "his engagement in relationships," referring to his "tumultuous relationship" with Lori prior to the offense and "unwillingness to be forthcoming and honest" about his disciplinaries in prison, which the panel believed involved an inmate with whom he was romantically involved. The panel found that if Shelton did not understand what "truly" led him to commit the life offense, "even at his advanced age of 64, there's a possibility that if he's faced with similar circumstances or if he's faced with a situation that can trigger whatever it was that triggered him in the life crime, there's a possibility that he can resort right back to that same type of behavior if he chose to do so in the future." He was told he needed to have the "ability to come into the room and . . . take responsibility," to "face the person that you were" and overcome the long time he had spent "being in denial."

At all three hearings, the panels acknowledged that Shelton was assessed as presenting a low risk of future violence, and acknowledged his "exemplary programming" and "all the great laudatory write-ups that you've been getting." Shelton did

not have a violent history: Dr. McManus referred to the life offense as "the only violent act or crime in his lifespan," and the few rules violations he incurred over his 28 years of incarceration did not involve actual violence, the only one alleging violence having been sustained as conduct "likely to lead to" violence.[10] The panels did not express concerns with Shelton's parole plans, which Dr. McManus described as "specific and feasible." In short, the denials were based on the panels' conclusions that Shelton's lack of insight into his criminal conduct left him vulnerable to repeating that conduct in the future.

As we explained in *Perez, supra,* 7 Cal.App.5th 65, the California Supreme Court made clear in *Shaputis II* that " '[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term "insight," but they direct the Board to consider the inmate's "past and present attitude toward the crime" (Regs.,

[10] Dr. McManus's risk assessment noted that Shelton reported having been involved in a bar fight early in his military career.

At the 2018 hearing, Shelton denied hitting Lori, even when she hit him, but acknowledged having "spanked her" to "make her quit" what she was doing. The panel viewed this as domestic violence that negated Shelton's claim he was not a violent man. Shelton's petition asserts that he testified he "might spank her on the butt . . . to make her quit hitting him," and the commissioner mischaracterized this as "violence used to get his wife to comply or listen to him." The record does not indicate what Lori was doing that he wanted her to "quit." In responding to the commissioner's question whether Lori wanted a divorce, Shelton had just referred to Lori having hit him in the mouth, but it is not clear that his comments about spanking her referred to the same occasion.

§ 2402, subd. (b)) and "the presence of remorse," expressly including indications that the inmate "understands the nature and magnitude of the offense." (Regs., § 2402, subd. (d)(3).) These factors fit comfortably within the descriptive category of "insight." ' (*Shaputis II*, [*supra*, 53 Cal.4th] at p. 218.) '[T]he presence or absence of insight is a significant factor in determining whether there is a "rational nexus" between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. (*Lawrence,* [*supra,* 44 Cal.4th] at p. 1227; see also *Shaputis I*, [*supra*, 44 Cal.4th] at p. 1261, fn. 20,.)' (*Shaputis II*, at p. 218.) Still, 'the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger.' (*In re Ryner* (2011) 196 Cal.App.4th 533, 548–549.) It has been noted that an inmate's lack of insight has taken the place of the heinous nature of the commitment offense as a standard reason to deny parole, 'so much so that it has been dubbed the " 'new talisman' " for denying parole.' (*Id.* at p. 547.)" (*Perez, supra,* 7 Cal.App.5th at pp. 85–86.)

The present case is particularly problematic because the record suggests Shelton's cognitive condition will *never* allow him to achieve and demonstrate the kind of insight the panels have been demanding. As described by Dr. McManus, Shelton's

26

neurocognitive disorder was a significant contributing factor in his commission of the life offense ("It seems more than coincidental that his life crime—the only violent act or crime in his lifespan—occurred around a year after his traumatic brain injury"), and his "key risk factor for violence." Accordingly, Shelton's "ability to understand and manage that condition in the community appears to be the key risk management target." Dr. McManus stated that there were signs Shelton's condition, diagnosed as "mild" in 2016, was "following a progressive course toward Moderate levels of impairment" and his "mental state during the current evaluation appeared markedly more impaired compared to his status during the 2013 evaluation. According to McManus, "it appears unlikely his neurocognitive disorder will improve in the future; in fact, it is more likely that the symptoms will worsen with age," and "[w]ith regard to insight, it is unlikely that his disorder will ever allow him to give a coherent narrative about his motivations at the time of the crime." Dr. McManus also viewed "neurological problems and confabulation" as "the most likely explanation for his memory problems and the associated additional problems with his mental status."

Further, Dr. McManus recounted that although there had always been discrepancies in Shelton's accounts of his head injury and life events, "evaluating clinicians (Board evaluations, military evaluation, multiple evaluations for competence to stand trial and criminal responsibility) have consistently concluded [Shelton] has not been lying/malingering. Rather, they have concluded he was compromised by neurological problems/

27

confabulation, delusional thinking, or neurotic amnesia."

While acknowledging the possibility that "the overwhelming confusion, and fearfulness he experienced the last time he attempted to reintegrate into the community" could recur, and that his lack of insight "would warrant consideration" during a transition to the community, Dr. McManus stated that the lack of insight had not led to violent outcomes in prison and "violence risk could likely be managed without full insight into the life crime, as long as he possesses insight into the vulnerabilities that would be most likely to lead to his use of violence (substance abuse, mental disorder, poor stress response, interpersonal needs)."

None of the commissioners who participated in Shelton's 2016, 2017, or 2019 parole suitability hearings expressed disagreement with Dr. McManus's assessment. But there is no indication in the record they gave any consideration to the likelihood that Shelton would never be able to achieve and articulate the understanding of the offense and its motivations they required of him. It is clear that Shelton's confused memory and differing accounts of various events were viewed by the commissioners as undermining his credibility. At the 2016 hearing, for example, the presiding commissioner asked whether Shelton ever looked at the shooting as an intentional act and told him he needed to be truthful with himself in order to "overcome the behavior." When Shelton responded that he had been trying and had "a real bad memory," the commissioner said, "Let me tell you this. If you can remember the children in Congo being killed

28

and beheaded, then you can remember what happened in this commitment offense."

To the extent Dr. McManus's assessment is correct—and the panel suggested no reason to question it—Shelton is unlikely to ever be able to coherently answer the panels' questions about his motivations for and understanding of the life offense. In this sense, the deficient insight upon which the panels based the denials of parole is effectively an immutable factor precluding parole.[11]

Our Supreme Court has stated that immutable facts such as the circumstances of the life offense or criminal history of the offender may be viewed as "some evidence" to support denial of parole "*only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1221.) As applied to deficient insight, the question is whether the deficiency is "*probative* to the central issue of *current* dangerousness when considered in light of the full record." (*Ibid.*)

The commissioner's concern was that Shelton's lack of insight left him at risk for future violence if faced with similar

---

[11] *Shaputis II*, *supra*, 53 Cal.4th at page 216, rejected a petitioner's argument that his inability to recall the circumstances of the crime was an immutable factor and he would be required to fabricate in order to show insight. There, however, there was nothing in the record indicating any problem with the petitioner's memory, and the denial of parole was based on other factors, as well as the petitioner's lack of insight. (*Ibid.*) Here, the record is clear that Shelton suffered traumatic brain injuries that have impaired his memory and other cognitive function for decades.

triggering circumstances. While reasonable enough as an abstract principle, this concern ignores facts specific to this case that seriously undermine any nexus between the deficiency in insight and dangerousness.

To begin with, the constellation of factors at play at the time of the life offense were so unique that it is difficult to imagine what similar circumstances might occur at this point in Shelton's life. Newly out of the army and suffering from a relatively recent traumatic brain injury that significantly affected his thinking, suffering pain from knee and back injuries sustained earlier in his military career, experiencing migraines and going blind in one eye, Shelton found himself unable to obtain medical treatment because of a "many-months long waitlist" at the VA. At the same time, he was working and going to school while trying to care for two young children and deal with a new and tumultuous marriage to a woman with serious alcohol problems and mother-in-law who he believed disrespected, insulted, belittled, and criticized him. Almost three decades later, Shelton has had years to adjust to his disabilities and their effect on his cognitive and physical condition; his children are adults; and he is no longer embroiled in tumultuous romantic or familial relationships. He has learned strategies for dealing with stress and anger that he did not know at the time of the life offense and he no longer feels paranoid.

Pursuant to the Board's regulations, "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole." (Regs., § 2402, subd. (b).)

One of the "Circumstances Tending to Show Suitability" for parole is that "[t]he prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time." (Regs., § 2402, subd. (d)(4).)  Accordingly, the Board *is required to consider whether the prisoner* committed *the crime as the result of significant stress in his or her life.*" (*In re Scott* (2005) 133 Cal.App.4th 573, 596, quoting *In re Rosenkrantz, supra,* 29 Cal.4th at p. 679; *In re Weider* (2006) 145 Cal.App.4th 570, 589–590.)

Shelton described himself as having been "stressed, very stressed" and "just about to go crazy" when he committed the life crime.  Dr. McManus stated that the "confusion he was experiencing at the time . . . appeared to be at the level of intensity similar to a delusion."

Of course, "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."  (Regs., § 2402, subd. (d).)  But there is no indication in the record that the panels gave any consideration to the potentially mitigating force of the stress under which Shelton was operating at the time of the life offense.  (*In re Weider, supra,* 145 Cal.App.4th at pp. 589–590 ["Board failed to acknowledge that the crime was the result of significant stress in [petitioner's] life"].)  On the contrary, the only sense in which the role of stress seems to have been considered was as an aggravating factor, with Shelton's "poor stress response" viewed as one of the risk factors he needed to be able to control.

31

Additionally, none of the panels appear to have considered Shelton's physical condition in evaluating his current risk for violence. Even aside from his traumatic brain injury, his physical condition has severely deteriorated over the years. He is designated "Permanently Mobility Impaired" and "Permanently Blind/Vision Impaired." He is blind in one eye. He has had knee and back surgeries, continues to have pain and has difficulty walking without a cane.

At each of the parole suitability hearings, the panels discussed Shelton's physical condition with respect to whether he needed any accommodations at the hearings. The record reflects no consideration, however, of how Shelton's physical disabilities bore on his potential for future violence. The magnitude of his disabilities, especially combined with the absence of history of violence apart from the life offense, logically warranted some consideration in determining whether Shelton continued to present a risk of danger to others.

More significantly, Shelton's physical condition was one of the factors to which the panels were required to give "special consideration" under the Elderly Parole Program. (Pen. Code, § 3055.) Section 3055 provides that when considering the release of an "inmate who is 60 years of age or older and has served a minimum of 25 years of continuous incarceration," "the board shall give special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence." (§ 3055, subd. (a), (c).)

32

As earlier described, with respect to the elderly parole considerations, the 2016 risk assessment stated that Shelton's neurological impairment "may be of a progressive nature which could eventually include symptoms of dementia" and therefore "he appears to be experiencing major medical/cognitive issues of particular relevance to this risk assessment, as a progressive neurological condition would likely diminish his physical strength and his capacity to effectively plan violence." While his impaired mobility "does not entirely rule out his potential to engage in less planned/sophisticated violence," Dr. McManus noted that Shelton had "demonstrated no motivation to act violently toward others," or to "engage in antisocial and rule-breaking behaviors." and viewed his "positive behavioral patterns" in prison as "likely influenced by the normal aging process and the effects of long-term confinement to some degree."[12] Dr. McManus described Shelton as "empathic" and appearing to have "a pro-social world view." He assessed Shelton as presenting a low risk of future violence, "expected to commit violence much less frequently than all other parolees."

The transcripts of the 2016, 2018, and 2019 parole suitability hearings reflect very little attention to the elderly parole considerations. At the outset each of the hearings, the presiding commissioner noted that Shelton was eligible for

---

[12] The only one of Shelton's prison rule violations that even came close to violence was the 2005 "conduct which could lead to violence," a lesser rule violation sustained after the disciplinary hearing officer determined the evidence did not substantiate the alleged "Mutual Combat."

consideration under the Elderly Parole Program,[13] and at each of the hearings the commissioner recited the statements about the elderly parole considerations in the 2016 risk assessment. At the 2016 hearing, there was no further reference to the elderly parole factors either during the hearing or in the panel's decision. In 2018, the panel mentioned the factors in its decision—but only in explaining why it was issuing a three-year denial rather than a longer one, not in connection with its decision on suitability.

The 2019 panel did discuss the elderly parole factors in its decision. The panel stated that it gave "special consideration to [Shelton's] age, long-term confinement, and diminished physical condition . . . during the hearing and also during deliberations," and listed among the factors it viewed as mitigating Shelton's risk, the facts that he was "at an age that reduces the probability [of] recidivism," was "64 years of age and ha[d] been incarcerated for almost 28 years for this crime." The panel also stated that it considered in mitigation the facts that Shelton had been "involved in and participated in extensive self-help programming during his incarceration" and the risk assessment determined he posed a "low risk of future violence, which means a non-elevated risk relative to other long-term offenders." After listing the

_____

[13] At the 2016 hearing, the commissioner stated only that Shelton was "being considered under Elderly Parole, that indicates that you at least are 60 years old and you've been in custody for at least 25 years." In 2018, there was a reference to Shelton being qualified for "the consideration" under the Elderly Parole Program. In 2019, the presiding commissioner stated the panel would give "special consideration" to the elderly parole factors.

mitigating factors, the presiding commissioner stated the panel found them "outweighed by factors obviously that aggravate his risk" and "despite . . . giving this special consideration to the factors related to elderly parole . . . we find that Shelton continues to be unsuitable."

The remainder of the decision addressed the panel's conclusions that Shelton was not credible in describing the life crime as an accidental shooting, lacked understanding of his violent actions, minimized his conduct and did not sufficiently take responsibility for it. This panel also emphasized that Shelton did not understand his "risk factors associated with . . . his engagement in relationships," which was of concern because "even at his advanced age of 64, there's a possibility that if he's faced with similar circumstances or if he's faced with a situation that can trigger whatever it was that triggered him in the life crime, there's a possibility that he can resort right back to that same type of behavior if he chose to do so in the future"; and that he minimized his actions and was not credible in discussing the crime. The panel found that Shelton's problems understanding and taking responsibility for his violent actions extended to his conduct in prison, as well as the life crime, drawing a connection between the life crime, which was related to his "tumultuous relationship" with his wife, and Shelton's 2005 and 2007 disciplinary violations involving Blake. The commissioners had questioned Shelton extensively about these disciplinaries and concluded he was lying about them; the panel saw a "strong indication" that Shelton was involved in a romantic relationship

with Blake and got into an argument over a ring that turned into "some type of physical altercation." The panel viewed the disciplinaries as tied to the life crime because they showed Shelton's inability to manage relationships, and his lying about the disciplinaries as revealing he was continuing to engage in "criminal thinking" and trying to "manipulate this panel" into believing the employees who observed the incident misinterpreted what they saw.

The panel returned to the elderly parole factors at the end of its decision, stating that it found a denial of more than three years inappropriate, based on his "advanced age that reduced the probability of recidivism," as well as his engagement in self-help programming and lack of "a violent serious rules violation in over 15 years."

Although the 2019 panel stated its conclusion that the mitigating factors, including Shelton being at an age that reduced the propensity for violence and having served a lengthy prison term, were outweighed by factors the panel viewed as making him a risk for future violence, it did not in any way explain this conclusion. It did not specifically address how the elderly parole considerations factored into its deliberations or how it viewed these considerations as affecting, or not affecting, his present risk. (*Lawrence, supra,* 44 Cal.4th at p. 1212 ["significant circumstance" for parole decision is how suitability and unsuitability factors "interrelate to support a conclusion of current dangerousness to the public"].)

Notably, the panel gave no indication how it considered the progressive decline in Shelton's physical condition and his present level of disability in determining that, due to his lack of insight, he might resort to violence if he found himself in circumstances that triggered "whatever it was that triggered him in the life crime." Although the presiding commissioner stated, in announcing the decision, that the panel was required to and did "give special consideration to [Shelton's] age, long-term confinement, and diminished physical condition," the list of mitigating factors the panel considered included only the first two of the elderly parole considerations, that Shelton was "at an age that reduces the probability [of] recidivism" and was "64 years of age and has been incarcerated for almost 28 years." The only other reference to elderly parole factors in the suitability decision was in the panel's statement that because Shelton did not understand his risk factors associated with relationships, "even at his advanced age of 64," there is a possibility he would resort to violence if faced with similar circumstances or a situation triggering what was triggered in him during the life offense.

It is apparent from this record that Shelton's traumatic brain injury negatively affected his cognitive functioning, both at the time of the life offense and later, with regard to his ability to remember and reflect upon his actions. According to the 2016 risk assessment, his condition was deteriorating as he aged. In addition, his mobility and vision were impaired. Having failed to address how Shelton's physical condition related to his risk for

37

future violence, the panels cannot be viewed as having given meaningful consideration to the elderly parole factors, much less the "special consideration" required by section 3055.

As we have said, Shelton's risk assessments (save one in 2006) have consistently determined he poses a low risk of future violence. He did not have a violent history before the life offense, he has not been involved in violence during his prison term, and his increasing age attenuates a propensity toward violence. The combination of challenges and pressures that contributed to his mental state at the time of the life offense were unique; while he might well face difficulties in transitioning to life in the community, it is difficult to imagine how he could face a similar set of circumstances at this point in his life. From participation in self-help programming while incarcerated, he has learned strategies for coping with stress and anger that he was not aware of earlier in his life. He recognizes alcohol was a factor contributing to his conduct, has consistently embraced AA during incarceration and plans to continue doing so if released. He has realistic plans for parole.

According to Dr. McManus, it is likely Shelton will never be able to address the motivations for the life crime coherently, but as long as he has insight into his risk factors for violence, he poses a low risk. Of course, while required to consider psychological assessments of the inmate (*Lawrence, supra,* 44 Cal.4th at p. 1213), the Board is not required to accept the opinion and conclusions of the evaluator. (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1202 ["assessment does not necessarily dictate

the Board's parole decision].)  Still, " '[i]n cases where psychological evaluations consistently indicate that an inmate poses a low risk of danger to society, a contrary conclusion must be based on more than a hunch or mere belief that he should gain more insight into his past behavior.  The Board must point to evidence from which it is reasonable to infer that the inmate's lack of insight reveals a danger undetected or underestimated in the psychological reports.'  (*Shaputis II, supra*, 53 Cal.4th at p. 228 (conc. opn. of Liu J.), citing *In re Roderick* (2007) 154 Cal.App.4th 242, 271–272.)"  (*Young, supra,* 204 Cal.App.4th at p. 312.)

None of the panels pointed to such evidence.  The panels announced their conclusions that Shelton lacked credibility, insight, empathy, and remorse without addressing how these conclusions took into account Shelton's consistently low risk assessments, Dr. McManus's opinions that Shelton's neurocognitive disorder made it unlikely he would ever be able to "give a coherent narrative about his motivations at the time of the crime," the disorder was progressive and his symptoms likely to worsen with age, his lack of insight had not led to violence during his incarceration, and it was likely his risk of violence in the community could be managed without full insight into the life offense as long as he had insight into the factors that would be most likely to lead to violence.

The Board's denials of parole to Shelton in 2016, on the ground his version of his criminal offense "defie[d] logic, and again in 2018, on the similar ground that his explanation of the

39

offense was improbable, and he failed to confront the offense "honestly" inexplicably ignore the confusion and memory loss Dr. McManus attributed to Shelton's traumatic brain injury, posttraumatic stress disorder, and other neurological impairments he considered "of a progressive nature which could eventually include symptoms of dementia." Such indifference to mental illness is incomprehensible in a system in which it is so eminently present. According to the Department of Corrections and Rehabilitation, 32 percent of the prison population in 2017 was mentally ill; and life prisoners like Shelton, whose sentences are set by the parole board, were found more likely than other inmates to be mentally ill. (Stanford Justice Advocacy Project, *Confronting California's Continuing Prison Crisis: The Prevalence and Severity of Mental Illness Among California Prisoners on the Rise* (2017) at p. 1) In a prison system in which the treatment of mentally ill inmates has been declared unconstitutional by the United States Supreme Court (*Brown v. Plata* (2011) 563 U.S. 493, affirming *Coleman v. Wilson* (E.D. Cal. 1995) 912 F.Supp. 1282), which found "overwhelming evidence of the systematic failure to deliver necessary care to mentally ill inmates" in California, the denial of parole on grounds so obviously related to mental illness adds insult to injury.

The additional factor emphasized at the 2019 hearing— Shelton's inability to manage relationships as a risk factor for violence—was based on the circumstances of the life offense and a 13-year-old rules violation for an incident involving an inmate with whom the panel believed Shelton had a sexual or romantic

40

relationship. Again, the panel did not explain how—in light of the intervening years, Shelton's positive engagement in self-help programming and deteriorating cognitive and physical condition —it found a nexus between this past conduct (or even Shelton's current refusal to acknowledge anything more than a friendship with the inmate) and current dangerousness.

To repeat, " 'parole is the rule, rather than the exception.' " (*In re Scott, supra,* 119 Cal.App.4th at p. 891; *In re Smith, supra,* 114 Cal.App.4th at p. 366.) "Under the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Shaputis II, supra,* 53 Cal.4th at p. 212.) In this case, due consideration of the relevant factors is lacking.

## DISPOSITION

The Board's decisions of December 21, 2016, and June 7, 2018, are hereby vacated. The matter is remanded for a new parole suitability hearing consistent with due process of law and this decision. (See *Prather, supra,* 50 Cal.4th at p. 244.)

                                              _____

                                              Kline, P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.


*In re Shelton, on Habeas Corpus* (A154938)

Trial Court:                    Solano County Superior Court

Trial Judge:                    Honorable Daniel Healy

Attorney for Petitioner:        By Appointment of the Court of Appeal
                                Under the First District Appellat Project
                                Shannon Chase

Attorneys for Respondent:       Attorney General of California
                                Xavier Becerra

                                Phillip J. Lindsay
                                Senior Assistant Attorney General

                                Sara J. Romano
                                Supervising Deputy Attorney General

                                Denise A. Yates
                                Deputy Attorney General